No. 22-2905

THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

City of East St. Louis, Illinois,

Plaintiff-Appellant

v.

Netflix, Inc., Disney Platform Distribution, Inc., Apple Inc., Hulu LLC,
WarnerMedia Direct, LLC, Amazon.com Services, LLC, CBS
Interactive Inc., Youtube LLC, CuriosityStream, Inc., Peacock TV, LLC,
DirecTV, LLC, and DISH Network, LLC
Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Illinois

Civil Action No. 2021-CV-00561
The Honorable Judge Mark A. Beatty

BRIEF AND REQUIRED SHORT APPENDIX OF
THE PLAINTIFFAPPELLANT, THE CITY OF EAST ST. LOUIS, ILLINOIS

MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
Melissa K. Sims
Attorney for the Plaintiff-Appellant

800 S. Gay Street, Suite 1100
Knoxville, TN 37929
(800) 530-9800
msims@milberg.com

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2905

Short Caption: City of East St. Louis, et al v. Netflix, Inc. et al No. 22-2905

 To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

 The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

The City of East St. Louis individually and on behalf of all others similary situated

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Melissa K. Sims, Victoria Maniatis, James DeMay Milberg Coleman Bryson Phillips Grossman, John Driscoll, Driscoll Law Firm

Marc Grossman     Patrick Wallace

Roy Mason, Zachary Howerton, Smouse & Mason, John BaricevicC.J. Baricevic, Chatham & Baricevic

(3) If the party, amicus or intervenor is a corporation:

 i) Identify all its parent corporations, if any; and

 n/a

 ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

 n/a

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 n/a

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 n/a

Attorney's Signature: Melissa K. Sims     *Melissa Sims*     Date: 10/31/22

Attorney's Printed Name:  Melissa K. Sims

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ✔     No ☐

Address:  100 Garden City

 Garden City, NY 11530

Phone Number: (800) 530-9800     Fax Number:

E-Mail Address: msims@milberg.com

rev. 12/19 AK

i

<u>TABLE OF CONTENTS</u>

DISCLOSURE STATEMENT……………………………………………………………i

TABLE OF AUTHORITIES……………………………………………………………...ii

JURISDICTIONAL STATEMENT………………………………………………………1

STATEMENT OF THE ISSUES…………………………………………………………2

STATEMENT OF THE CASE……………………………………………………………3

    I.      Procedural History……………………………………………………………3

    II.    Facts…………………………………………………………………………...4

SUMMARY OF ARGUMENT…………………………………………………………10

ARGUMENT……………………………………………………………………………12

    I.      Standard of review: *De novo*……………………………………………………12

    II.    The District Court Erred when it Dismissed the City's Express Right of Action under the Statute………………………………………………………………………12

    III.   The District Court Erred when it Dismissed with Prejudice the City's Implied Right of Action against the Streaming Companies…………………………………………15

    IV.   The District Court Committed Reversable Error when it Concluded that the City did not Allege a Physical Trespass in the Amended Complaint…………………………19

    V.    City has Stated a Claim for Unjust Enrichment under Illinois Law…………………24

    VI.   The District Court Erred when it Dismissed the City's Ordinance Claim by Applying the Standard for Third Parties Seeking to Use a City Code as a Private Right of Action……………………………………………………………24

CONCLUSION ………………………………………………………………………27

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7), 32(g) and CR 32 (c)……...29

PROOF OF SERVICE……………………………………………………………..…30

CIRCUIT RULE 30 (d) STATEMENT…………………………………………………31

ATTACHED REQUIRED SHORT APPENDIX…………………………………………32

TABLE OF AUTHORITIES

Cases

*1541 N. Bosworth Condo. Ass'n v. Hanna Architects, Inc.,* 2021 WL 6135459, (Ill. App. Ct. 2021) *appeal denied*, 453 Ill.Dec. 251, 187 N.E.3d 704 (Ill. 2022)…………………………14, 26

*ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist,* 672 F.3d 492, 498 (7th Cir. 2012)….13

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)……..………………………………………………12

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)………………………………………..12

*Benno v. Cent. Lake Cnty. Joint Action Water Agency,* 242 Ill.App.3d 306, 609 N.E.2d 1056, 1061 (1993)………………………………………………………………………………..20, 24

*Borough of Longport v. Netflix, Inc.* No. CV-21-15303, 22 WL 1617740 (D.N.J. May 20, 22)..18

*Carmichael v. Pro. Transportation, Inc.,* 2021 WL 3925613, (Ill. App. Ct. 2021), *appeal denied,* 451 Ill.Dec. 433, 183 N.E.3d 890 (Ill. 2021)……………………………………………......19

*Christensen v. Cnty. of Boone,* 483 F.3d 454, 457 (7th Cir. 2007)………………………………12

*City of Ashdown, Arkansas v. Netflix, Inc,* 565 F. Supp. 3d 1111 (W.D. Ark. 2021)……………17

*City of Chicago v. F.C.C.,* 199 F.3d 424, 433 (7th Cir. 1999)…………………………………...22

*City of Creve Coeur v. Netflix et al.,* 18SL-CC022819 (12/30/20)………………..……..…17

*City of Geneseo v. Illinois Northern Utilities Co.,* 39 N.E.2d 26, 378 Ill. 506, (1941) *certiorari denied* 62 S.Ct. 1046, 316 U.S. 670, 86 L.Ed. 1746…………………………………23

*City of Kenner v. Netflix, Inc. and Hulu, LLC*………………………………………..……..18
Case No. 814-168, 2022 WL 4101746 (24th Jud. Dist., P. Jefferson, LA Aug. 25, 2022)

*City of Knoxville v. Netflix, Inc.,* 656 S.W.3d 109 (Tenn 2022)…………………………………18

*City of Lancaster v. Netflix,* No. 21STCV01881, 2021 WL 4470939, (Cal. Sup. Ct., Sep. 20, 2021)………………………………………………………………………………………..18

*City of Maple Heights v. Netflix, Inc., et al.,* 2022 WL 17331374 (Ohio 2022)…………………18

*City of New Bos. v. Netflix, Inc.,* 565 F. Supp. 3d 865 (E.D. Tex. 2021)…………………..……18

*City of Reno, Nevada v. Netflix, Inc.,* 558 F. Supp. 3d 991 (D. Nev. 2021)……………..………17

*City of Springfield v. Postal Telegraph-Cable Co.,* 97 N.E. 672, 253 Ill. 346 (1912)…………..24

*Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011)………………………………...24

*Colwell Systems, Inc. v. Henson*, 72 Ill.Dec. 636, 452 N.E.2d 889, 892 (1983)………………...20

*Commonwealth Electric Co. v. Rose,* 73 N.E. 780, 214 Ill. 545 (1905)…………………………24

*Crittenden v. Cook County Comm'n on Human Rights,* 362 Ill.Dec. 308, 973 N.E.2d 408. (1st App 2012)……………………………………………………………………………………………25

*Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345, 1351 (7th Cir. 1995)…………………………20

*Dial v. City of O'Fallon,* 81 Ill.2d 548, 44 Ill.Dec. 248, 411 N.E.2d 217, 220 (1980)………….20

*Eighner v. Tiernan,* 451 Ill.Dec. 607, 184 N.E.3d 194,  (Ill. 2021)……………………………...13

*Frye v. Auto-Owners Ins. Co.,* 845 F.3d 782, 786 (7th Cir. 2017)………………………………13

*Gassman v. Clerk of the Cir. Ct. of Cook Cnty.,* 410 Ill.Dec. 787, 1 N.E.3d 783 (Ill. App. Ct. 2017……………………………………………...……………………………………………………14

*Geller v. Brownstone Condominium Assoc.,* 82 Ill.App.3d 334, 37 Ill.Dec. 805, 402 N.E.2d 807, 809 (1980)……………………………………………………………………………………………20

*Great Atl. & Pac. Tea Co., Inc. v. LaSalle Nat. Bank,* 77 Ill.App.3d 478, 32 Ill.Dec. 812, 395 N.E.2d 1193, 1196 (1979)…………………………………………………………………………20

*Gwinnett County, Georgia v. Netflix, Inc.,* No. 20-A-07909-10, 2022 WL 678784, (Ga. Superior Ct. Feb. 18, 2022)………………………………………………………………………….……18

*Haage v. Zavala,* 451 Ill.Dec. 373, 183 N.E.3d 830, 842 (Ill. 2021)……………………………13

*Horist v. Sudler & Co.*, 941 F.3d 274, 278 (7th Cir. 2019)………………………………………...15

*Hubble v. Bi-State Dev. Agency of Illinois-Missouri Metro. Dist.,* 238 Ill.2d 262, 345 Ill.Dec. 44, 938 N.E.2d 483, 489 (2010)……………………………………………………………………...13

*In re: Clearview AI, Inc., Cons.Priv. Lit.*, 2022 WL 444135 (N.D. Ill, E.D. 2022)……………..24

*In re: Definition of a Cable Television Sys.,* 5 FCC Rcd. 7638, 7642 (1990)………..…………23

*In re: Hernandez,* 918 F.3d 563 (7th Cir. 2019)…………………………………………………13

*Int. Paper Co. v. MCI WorldCom Network Serv., Inc.,* 442 F.3d 633 (8th Cir.2006)…………...21

*Isaacs v. Sprint Corp.*, 261 F.3d 679 (7th Cir.2001)…………………………………………………21

*Labell v. City of Chicago,* 439 Ill.Dec. 57, 147 N.E.3d 732 (Ill. App. Ct. 2019), *petition for leave to appeal denied,* 437 Ill.Dec. 585, 144 N.E.3d 1175 (Ill. 2020)………………………………..23

*Leo Sheep Co. v. United States,* 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979)…………21

*Loftus v. Mingo,* 110 Ill.Dec. 368, 511 N.E.2d 203, 210 (1987)………………………….………..20

*McDaniel v. Qwest Communications Corp.* 2006 WL 1476110 (N.D.IL 2006)………………..20

*McGrath v. City of Kankakee,* 403 Ill.Dec. 864, 55 N.E.3d 51 (IL App. 2016)……...................25

*Medicos Pain & Surgical Specialists, S.C. v. Travelers Indem. Co. of Am.,* 422 Ill.Dec. 601, 103 N.E.3d 965, 972 (Ill. App. Ct. 2018)…………………………………………………………………14

*Michigan Ave. Nat'l Bank v. Cnty. of Cook,* 191 Ill.2d 493, 247 Ill.Dec. 473, 732 N.E.2d 528, 535 (2000)…………………………………………………………………………………………..13

*Midwest Med. Recs. Ass'n, Inc. v. Brown,* 420 Ill.Dec. 551, 97 N.E.3d 125 (Ill. Ct. 2018)…….14

*Mulligan v. QVC, Inc.,* 888 N.E.2d 1190, 382 Ill.App.3d 620, 631 (1st Dist. 2008)……………24

*Napleton v. Village of Hinsdale,* 229 Ill. 2d 296, 322 Ill.Dec. 548, 891 N.E.2d 839 (2008)….…25

*Peeler v. MCI, Inc.,* 447 F.3d 992 (7th Cir. 2006) …………………………………………..20, 21

*People v. Donoho,* 204 Ill.2d 159, 273 Ill.Dec. 116, 788 N.E.2d 707, 715 (2003)……………..13

*Primeco Pers. Commc'n v. Ill. Commerce Comm'n,* 196 Ill.2d 70, 750 N.E.2d 202 (2001)……23

*Schweihs v. Chase Home Fin. LLC,* 453 Ill.Dec. 458, 87 N.E.3d 1196  (Ill. Ct. 2021)………...20

*Smith v. Sprint Communications Co., L.P.*, 387 F.3d 61234Communications Reg. (P&F) 314 (7th Cir. 2004) …………………………………………………………………...………..20, 21

*Swanson v. Citibank, N.A.,* 614 F.3d 400, 404 (7th Cir. 2010)…………………………….………12

*Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir. 2008)…………………………….……..12

*Toushin v. Ruggiero*, 2021 WL 2718495 (Ill. Ct. 2021)……………………………….……...24

*Uhl v. Thoroughbred Tech. and Tele., Inc.,* 309 F.3d 97853 (7th Cir. 2002)……………………20

*Zografos v. Qwest Communications Corp.,* 225 F.Supp.2d 1217, 1223 (D. Or. 2002)………….21

Federal Statutes

12 U.S.C. § 1291………………………………………………………………………….1

47 U.S.C. § 522(6)………………………………………………………………………...6

State Statutes

65 ILCS 5/11-42-11.05 (d)…………………………………………………………..10, 14

220 ILCS 5/21-100..……………………………………………………………….2, 3, 5

220 ILCS 5/21-201(u)-(v)..………………………………………………………5, 6, 14

220 ILCS 5/21-301(a)……………………………………………………………….5, 6

220 ILCS 5/21-801..…………………………………………………………….14, 15

220 ICLS 5/21-901…………………………………………..…………10, 12, 14, 16

220 ILCS 5/22-501……………………………………………………………………17
815 ILCS 505/1 ……………………………………………………………………17

IL S. Tran. 2007 Reg. Sess. No. 57, Senate Transcript, 95th General Assembly…………..16, 17
Regular Session, 57th Legislative Day, June 19, 2007, Illinois Senate 95th General Assembly

H.R. Rep. No. 98-934, at *83 (1984), reprinted in 1984 U.S.C.C.A.N. 4655, 4720…………..25
Illinois Senate Bill 678, Bill for an Act Concerning Telecommunications, 95th General
Assembly, House Proceedings, May 31, 2007, at 234

Rules

Federal Rule Civil Procedure 12(b)(6)……………………………………..………1, 3, 12
Illinois Supreme Court Rule 572 (a)(4)……………………………………...……….26
Illinois Supreme Court Rule 572 (d)……………………………………...……….26

City Ordinances

East St. Louis Code Ord. §82-20……………………….……………………………25
East St. Louis Code Ord. §82-19……………………….……………………………3, 25
East St. Louis Code Ord §1-15……………………….………………………………26

## JURISDICTIONAL STATEMENT

*A.    Statement of Jurisdiction for the United States District Court*

The district court had jurisdiction over this action in accordance with 28 U.S.C.§1332(a) and (d). Defendants-Appellees are citizens of the State of different states from that of the Plaintiff-Appellant, the putative class size is greater than 100, and the aggregate amount in controversy for the proposed Class exceeds $5,000,000.00, exclusive of interest and costs. Appellant, the City of East St. Louis, Illinois, is an Illinois municipally and is a citizen of the State of Illinois. Appellees Netflix, Inc. ("Netflix"), Apple Inc. ("Apple"), Hulu, LLC ("Hulu"),  YouTube, LLC ("YouTube"),  and Directv LLC ("Directv") are citizens of the State of  California. Appellees Disney Platform Distribution, Inc. ("Disney"), WarnerMedia Direct, LLC ("Warner"), CBS Interactive Inc. ("CBS"),  and PeacockTV, LLC ("Peacock") are citizens of the State of  New York.  Appellee, CuriosityStream, Inc. ("CuriosityStream") is a citizen of the State of  Maryland. Appellee, DISH Network, L.L.C. ("Dish") is a citizen of the State of  Colorado.

*B.    Statement of Jurisdiction for the United States Court of Appeals*

The jurisdiction of the United States Court of Appeals for the Seventh Circuit is brought under 28 U.S.C. § 1291. This appeal is taken from the final decision of the U.S. District Court for the Southern District of Illinois entered on September 23, 2022 by the Honorable Judge Mark A. Beatty granting Defendants' Motions to Dismiss for Failure to State a Claim pursuant to Fed. Rule 12(b)(6) and dismissing with prejudice the Plaintiff's Amended Class Action Complaint.  The appeal is from an order and final judgment that adjudicated all of the claims with respect to all parties, and no parties or issues remain in the District Court. Appellant did not file a motion for new trial or alteration of the judgment.

The notice of Appeal was filed on October 24, 2022.

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in granting the motion to dismiss in favor of the Defendants-Appellees (the "Streaming Companies") by concluding that neither a unit of local government not the state can maintain a cause of action pursuant to the Illinois' Cable and Video Competition Law (220 ILCS 5/21-100 *et. seq*) (the "CVCL") against a party which does not have a holder certificate from the Illinois Commerce Commission.

2.      Whether the district court erred in granting the motion to dismiss in favor of the Streaming Companies by concluding that the City of East St. Louis, Illinois (the "City") did not have an express right of action to bring its declaratory judgment claim when the statute specifically addresses a unit of local government's right to maintain an action for fees which is the nature of the current lawsuit.

3.      Whether the district court erred in granting the motion to dismiss in favor of the Streaming Companies when the CVCL was enacted to protect local government from losing revenue by requiring video service providers to pay the units of local government 5% of the gross revenue when the video content is transmitted at least in part through the public rights of ways.

4.      Whether the district court erred in granting the motion to dismiss the City's trespass and unjust enrichment claims in favor of the Streaming Companies when the City adequately plead that the Streaming Companies have entered into interconnection agreements to link their equipment to local internet service providers (ISP's) which are located within  the public rights of ways without the permission of the units of local government in the State of Illinois.

5.      Whether the district court erred in granting the motion to dismiss the City's ordinance violations by applying the wrong standard that cities cannot assert direct violations and civil monetary penalties for the resale of cable communication as prohibited by ordinance.

2

STATEMENT OF THE CASE

I.      *Procedural History*

The City initiated this class action complaint seeking a declaration and statutory damages that the Streaming Company Defendants' violated the Illinois' Cable and Video Competition Law (220 ILCS 5/21-100 *et. seq*) (the "CVCL") by providing video service to Illinois residents through the public rights of ways without either state or local authority. (R. 167 "Amended Complaint"). On September 23, 2022, the district court entered its final judgment (R. 207 "MTD Order") granting the Streaming Companies' motions to dismiss pursuant to Federal Rule 12(b)(6), holding that the neither the City nor the State of Illinois has the right to seek statutory compensation against a non-holder under the CVCL. The district court also dismissed the City's common law counts of trespass and unjust enrichment and the City's ordinance count for the unlawful resale of cable communication. This appeal presents issues as to the district court's ruling on the September 23, 2022 order granting the Streaming Companies' motion to dismiss with prejudice.

II.     *Factual Summary*

The City of East St. Louis, Illinois brought this putative class action against Defendants on behalf of all Illinois cities, villages, incorporated towns, and counties in which one or more of the Streaming Companies provide video service (Amended Complaint). The City alleged that the Streaming Companies have all engaged in ongoing violations of the Illinois CVCL by providing video service using the public rights-of-way without first obtaining authorization from the Illinois Commerce Commission and without paying the requisite fees to municipalities (Counts 1 and 2). The City also asserted claims for trespass (Count 3), unjust enrichment (Count 4), and violation of East St. Louis Municipal Ordinance § 82-19 (Count 5).

The phenomenon of companies avoiding payments to the City for the utilization of a local government's right of way has gone on completely unchecked for years. This "cord cutting" has caused substantial losses to the local governments of Illinois to the great profit of the Streaming Companies because Streaming Companies are not paying for the 5% gross revenue when residents switch from cable to streaming. This shortfall has jeopardized precious revenue necessary to fund the critical government infrastructure that provides for the health, safety and welfare of Illinois residents has been lost purely to line the pockets of the Streaming Companies. (R. 184, "Omnibus Response to MTD", Page 54.)  Indeed this "cord cutting" is expected to strip nearly $33.6 billion in annual revenue from traditional U.S. cable television services in the five-year outlook (Id.) Households relying entirely on aggregated over-the-top video choices, meanwhile, will grow to eighteen million, as public forecasters predict, accounting for 14% of American households. (Id.) Moreover, as illustrated below, the impact of the migration of consumers from big subscription cable services that pay fees to local governments, establishes that the latest forecasts for cable, direct broadcast satellite and telco multichannel revenue, will plummet by nearly one third, from $91.1 billion in 2021 to $64.7 billion by 2025. The switch from cable to streaming trend mans the cities lose their 5% gross revenue from residents in Illinois.



Estimated and projected traditional U.S. multichannel revenues, 2016-2025

As of September 2021.
Historical revised.
Includes commercial and residential revenue. Excludes advertising.
* Includes subs and revenues from DIRECTV and DISH Network satellite delivery. Excludes Sling TV, AT&T TV NOW (formerly DIRECTV NOW) and DIRECTV Stream (formerly AT&T TV).
Sources: Industry data; Kagan estimates
Kagan, a media research group within the TMT offering of S&P Global Market Intelligence.
© 2021 S&P Global Market Intelligence. All rights reserved.

4

In Illinois, all persons or entities "seeking to provide cable service or video service" (emphasis added) are required to obtain authorization from the government to provide their services. *E.g.,* 220 Ill. Comp. Stat. 5/21-301(a). Such authorization is commonly referred to as a "franchise." In the past, providers had to obtain authorization from each individual municipality. *See* Illinois Senate Bill 678, Bill for an Act Concerning Telecommunications, 95th General Assembly, House Proceedings, May 31, 2007, at 234 (statement of Rep. Brosnahan). But in 2007, Illinois enacted the Cable and Video Competition Law (220 Ill. Comp. Stat. 5/21-100, *et. seq*) (the "CVCL"), to allow providers to obtain a single state-wide authorization from the Illinois Commerce Commission. 220 Ill. Comp. Stat. 5/21-301(a).

Under the plain language of the CVCL, authorization from the State of Illinois is required if an entity seeks to offer "video service," which is: (1) video programming generally comparable to programming provided by a television broadcast station; (2) that is provided through wireline facilities located at least in part in the public rights-of-way without regard to delivery technology, including Internet protocol technology; (3) but is not provided solely as part of, and via, a service that enables users to access content, information, electronic mail, or other services offered over the public Internet. 220 ILCS 5/21-201(u)-(v).

The CCVL requires that video service providers apply for authorization and become "holders" if the provider:

OPTION 1:   INSTALLS OR CONSTRUCTS INFRASTRUCTURE LOCATED IN THE RIGHT OF WAY

(a)(1) A person or entity seeking to provide cable service or video service pursuant to this Article shall not …use the public rights-of-way for the installation or construction of facilities for the provision of cable service or video service…  until it has obtained a State-

5

issued authorization to offer or provide cable or video service under Section 401 of this Article. 220 ILCS 5/21-301 (a)(1).

OPTION 2:   IS   A   STREAMING   COMPANY   WHICH     DOES   NOT   OWN INFRASTRUCTURE IN THE RIGHT OF WAY

(a)(1) A person or entity seeking to provide cable service or video service pursuant to this Article shall not …offer cable service[1] or video service[2]…until it has obtained a State-issued authorization to offer or provide cable or video service under Section 401 of this Article. 220 ILCS 5/21-301 (a)(1).

Rather than apply to become holders, the Streaming Companies have entered into confidential "interconnection" agreements with authorized holders to circumvent the nature and purpose of the statute, all to avoid paying cities their 5% fee. (Amended Complaint ¶¶63-69.) According to the City's complaint, some or all of the Streaming Companies install their own equipment and provide video service, meeting both criteria as holders under the CVCL. (Id. ¶¶40-46, 64-68.) The CVCL imposes numerous requirements on "holders," the entities who are granted state-wide authorizations to offer or provide cable or video service. *See* 220 Ill. Comp. Stat. 5/21-601, 701, 801, 901, 1001, 1101. *See also id.* at 201(k) (defining "holder). Most notably, holders are required to pay a service provider fee to all local units of government within whose boundaries the holders offer cable or video service. *Id.* at 801(b). To that end, before offering cable service or video service within the jurisdiction of a local unit of government, a holder is required to notify

---

[1] 47 U.S.C. 522(6)
[2] 220 ILCS 5/21-201(v)

the local unit of government. *Id.* at 801(a). The local unit of government is then required to adopt an ordinance imposing the service provider fee. *Id.* at 801(b).

As alleged in the Amended Complaint, Netflix uses "Open Connect." (Amended Complaint ¶¶40, 41, 42, 43, 44, 45, 55.) Netflix has placed its Open Connect servers in over 1,000 locations across the globe, and many of these servers are directly connected to a local ISP's network facilities including the vicinity of East St. Louis. (Id. ¶55.) When a Netflix subscriber wants to view Netflix video programming, they are connected to the nearest Netflix Open Connect server or broadcasting the subscriber's antenna. In this way, Netflix delivers its content via the local ISP's private network facilities without using the public internet. (Id.) According to Netflix: "(e)ven though millions of people around the world will be watching, there will be very little additional traffic on the 'internet' because of a decision we made in 2011 to build our own <u>content delivery network</u>, or CDN." (Id. ¶55) (*emphasis added*). Netflix also created Open Connect Appliances ("OCA") which are servers and store Netflix's video content that are placed near highly populated areas of the country to satisfy the public's demand for "millisecond" delivery over local cable networks. (¶43). OCAs are purpose-built server appliances which store encoded video/image files and serve these files to client devices (for example: set top boxes, mobile devices, or smart TVs) by physically connecting to <u>the local ISP's private network facilities</u>. (Id.) OCAs have the sole responsibility of delivering playable bits to client devices as fast as possible. (Id.)



Netflix provides the OCAs to qualifying internet service providers and the OCAs are then deployed directly inside the ISP networks. The internet service provider partner uses the OCA to provide video content to its Netflix subscribers. Close to 90% of Netflix's global traffic is delivered via these direct connections between OCAs and the ISPs. (Amended Complaint ¶44). Because of the speed of delivery required, all of these services that store the video content must be both proximate to populated areas of subscribers and have cable access to the homes of these subscribers.

This case involves the CVCL's application to the twelve Defendants, who are all "over the top" video service providers that charge subscribers a fee to access and stream their programming. (Id. ¶¶5–17, 30, 33). As alleged in the Amended Complaint, Defendants provide video content, not internet access. The "service that enables users to access content, information, electronic mail, or other services offered over the public Internet" is provided by the ISPs and is not part of the services provided by the Streaming Companies. (Id. ¶52.)

To watch Defendants' video content, subscribers use their own internet-connected device (such as smart televisions, streaming media players like Roku or Apple TV, tablets, smartphones, personal computers, etc.) (Amended Complaint ¶37). And subscribers connect to the internet through the internet service provider ("ISP") of their choice (Id. at ¶52). Defendants' subscribers typically use a broadband internet connection, such as DSL or fiber optic cable, to view Defendants' video content (Id at ¶48). A broadband connection relies on the ISPs' wireline facilities located in whole or in part in the public right(s)-of-way (Id. at ¶¶36, 50). In other words, Defendants' video content is delivered from their servers to subscribers' devices through third-party ISPs' wireline facilities located in the public rights-of-way. Defendants do not provide internet access, nor do they own, control, or operate wireline facilities in any Illinois public right-of-way (Id at ¶¶52, 60). They are able to avoid such direct ownership through their contracts with local wireline facilities to deliver their video content to their subscribers.

## SUMMARY OF THE ARGUMENT

Because the Streaming Companies have no authority from the City to place equipment on- or linked to--the public rights of ways, they have improperly offered video service in the State of Illinois. The City seeks compensation, damages and civil monetary penalties under the municipal code. The City's Amended Complaint sought relief under the CCVL which mandates fees to a unit of local government plus an audit and a deficiency action. According to the district court's ruling, because the Streaming Companies are not "holders" under the CVCL, there is no recourse by either the City or the Attorney General. The Streaming Companies argue that, because they are not "holders" under the CVCL, neither the City nor the State can bring any action against them. The district court agreed and neutered the enforcement provision of the CVCL. The City is authorized to bring an action against a "holder" for the collection of a deficiency or lack of payment of the 5% of gross revenues in a court of competent jurisdiction. 220 ICLS 5/21-901; 65 ILCS 5/11-42-11.05 (d). To circumvent the CVCL, some or all of the Streaming Companies have entered into side agreements with holders to place equipment on or connected to the public rights of ways to stream their video content without authority from the City.

The district court erred when it dismissed the City's Amended Complaint  and found "that the CVCL did not contemplate suits such as the instant case to compel video service providers who are non-holders to apply for a state-wide authorization under the CVCL or to comply with the CVCL's requirements." (MTD Order at 5.) The City never sought such relief. The district court erred when it dismissed the City's Amended Complaint and found that the City lacked the ability to bring its action as an implied right under the CVCL when the CVCL contained provisions as contemplated by the legislature that the cities would not lose revenue, leaving no adequate remedy at law to recoup revenue lost as a result of the Streaming Companies' interconnection agreements.

10

The district court erred when it dismissed the City's trespass claim, finding that there was no physical invasion of the rights of ways. The district court erred when it applied the wrong standard regarding the City's ability to enforce its own ordinances, relying on standards for a third party right of action.

ARGUMENT

I.      *Standard of Review: De novo*

In order to sustain a complaint under a Fed. Rule 12(b)(6) analysis, a complaint "need only provide a short and plain statement of the claim showing that the pleader is entitled to relief, sufficient to provide the defendant with fair notice of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 8(a)(2). The complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). To satisfy this standard of facial plausibility, a City must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

At the motion to dismiss stage, it is not the rule of the court to "decide whose version to believe, or which version is more likely than not." *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404 (7th Cir. 2010). Instead, a court must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the Plaintiff's favor. *E.g., Christensen v. Cnty. of Boone,* 483 F.3d 454, 457 (7th Cir. 2007).

II.     *The District Court Erred when it Dismissed the City's Express Right of Action under the Statute*

It is indisputable that a unit of local government can bring an action against a holder under the CVCL. The plain language of the CVCL provides a right of action against holders to account for the 5% gross fee. 220 ILCS 5/21-901. The question here is not whether the City can sue a holder, but whether the City can sue the Streaming Companies who have bypassed the system and never applied, nor received, holder certificates from the Illinois Commerce Commission.

The district court was correct that no previous cases have challenged this authority and that, consequently, a federal court must interpret the statute as it thinks the Illinois Supreme Court would interpret it. *Frye v. Auto-Owners Ins. Co.*, 845 F.3d 782, 786 (7th Cir. 2017); *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012). As a federal court interpreting Illinois law, the Court must apply Illinois' rules of statutory construction. *In re Hernandez*, 918 F.3d 563, 569 (7th Cir. 2019) (citation omitted). "The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature[.]" *In re Hernandez*, 918 F.3d at 569 (citing *People v. Donoho*, 204 Ill.2d 159, 273 Ill.Dec. 116, 788 N.E.2d 707, 715 (2003)). "The best evidence of legislative intent is the statutory language," which must be given its plain and ordinary meaning. *Donoho*, 273 Ill.Dec. 116, 788 N.E.2d at 715; *Haage v. Zavala*, 451 Ill.Dec. 373, 183 N.E.3d 830, 842 (Ill. 2021). When construing statutory language, the statute must be considered in its entirety; words and phrases must be interpreted in light of other relevant provisions of the statute and must not be construed in isolation. *Eighner v. Tiernan*, 451 Ill.Dec. 607, 184 N.E.3d 194, 199 (Ill. 2021); *Hubble v. Bi-State Dev. Agency of Illinois-Missouri Metro. Dist.*, 238 Ill.2d 262, 345 Ill.Dec. 44, 938 N.E.2d 483, 489 (2010). In addition to the language of the statute, the court, in determining legislative intent, may also consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another. *Hubble*, 345 Ill.Dec. 44, 938 N.E.2d at 489. In construing a statute, courts presume that the General Assembly did not intend absurdity, inconvenience, or injustice. *Michigan Ave. Nat'l Bank v. Cnty. of Cook,* 191 Ill.2d 493, 247 Ill.Dec. 473, 732 N.E.2d 528, 535 (2000). The legislative intent was to ensure local government in Illinois do not lose precious revenue, which is precisely the matter at bar.

13

Under Illinois law, a party can file suit for violation of a statute only if the statute provides a right of action. *See Medicos Pain & Surgical Specialists, S.C. v. Travelers Indem. Co. of Am.*, 422 Ill.Dec. 601, 103 N.E.3d 965, 972 (Ill. App. Ct. 2018); *Midwest Med. Recs. Ass'n, Inc. v. Brown*, 420 Ill.Dec. 551, 97 N.E.3d 125, 136 (Ill. App. Ct. 2018) (citing *Gassman v. Clerk of the Cir. Ct. of Cook Cnty.*, 410 Ill.Dec. 787, 71 N.E.3d 783, 790 (Ill. App. Ct. 2017). "A statute may provide for an express right of action to redress a violation of its provisions." *1541 N. Bosworth Condo. Ass'n. v. Hanna Architect, Inc.*, 2021 WL 6135459 *5 (App. Ct. 2021), *appeal denied*, 453 Ill.Dec. 251, 187 N.E.3 704 (Ill. 2022). When a statute does not expressly provide for a private right of action, a court can consider whether an implied right of action exists. *Id.*

The district court erroneously ruled that the City was attempting to "compel video service providers who are non-holders to apply for a state-wide authorization under the CVCL or to comply with the CVCL's requirements." (MTD Order, page 5). However, the City never sought civil monetary penalties due the state or compel the Streaming Companies cure any defect with the Illinois Commerce Commission. The City sought only a declaration that the Streaming Companies violated 220 ILCS 5/21-201 and 220 ILCS 5/21-801. (Amended Complaint, relief (c), page 36.) The City never sought to enforce or order the Streaming Companies to do anything other than pay the 5% gross revenue.

The City does have an express right of action to audit and file suit against a holder that has received a State-issued authorization derived from the provision of cable or video services to subscribers within the holder's service territory. 220 ILCS 5/21-901(a), (b), 65 ILCS 11-42-11.05. The CVCL requires that pro rata portion of all revenue derived by the holder---or its affiliates---- pursuant to compensation arrangements for advertising or for promotion or exhibition of any products or services derived from the operation of the holder's network to provide cable service or

video service within the local unit of government's jurisdiction. The allocation shall be based on the number of subscribers in the local unit of government divided by the total number of subscribers in relation to the relevant regional or national compensation arrangement. 220 ILCS 5/21-801(c)(1) (*emphasis added*).

III.     *The District Court Erred when it Dismissed with Prejudice the City's Implied Right of Action against the Streaming Companies*

The district court erred when it ruled the City lacks an implied right of action to bring its claims.  Under Illinois law, courts will recognize an implied right of action only if all four of the following criteria are met: (1) the plaintiff is a member of the class for whose benefit the statute was enacted; (2) the plaintiff's injury is one the statute was designed to prevent; (3) a private right of action is consistent with the underlying purpose of the statute; and (4) implying a private right of action is necessary to provide an adequate remedy for statutory violations. *Horist v. Sudler & Co.*, 941 F.3d 274, 278 (7th Cir. 2019). The district court focused on the final two factors in its Order, namely whether a private right of action is consistent with the underlying purpose of the statute and whether a private right of action is necessary to provide an adequate remedy at law.

As a result of  the Court's opinion, neither the City nor the State can bring a cause of action against the Streaming Companies because the companies never sought holder status. (Order, page 5). The Attorney General is authorized to administer and ensure holders' compliance, which the City is not seeking in this litigation:

> The Attorney General is responsible for administering and ensuring holders' compliance with this Article, provided that nothing in this Article shall deprive local units of government of the right to enforce applicable rights and obligations. 220 ILCS 5/21-1301(a).

15

A plain reading of the CVCL and the Public Utilities Code gives local government a right of action against to collect fees under the CVCL. 220 ILCS 5/21-901(a) The City has the authority to impose reasonable terms regarding the placement of a cable service, video service, or telecommunications network or equipment in public rights-of-way. 220 ILCS 5/21–1001

There is no mystery in the CVCL's allowance of the local units of government to enforce "applicable rights and obligations" – the rights and obligations are spelled out in the CVCL and the City is attempting though this action to collect the statutory fee. Adopting the Court's reading of the statute would leave every city entirely powerless to enforce any right under the CVCL to, among other things, collect a fee of 5% of gross revenues from video service providers for the use of its public rights-of-way.

The legislative intent also supports the City's contention. The June 19, 2007 Senate transcript of the 95th General Assembly reveals that local government remedies were included:

-------------------------------------------------------------------------

SENATOR RISINGER:

Thank you, Senator. The mayors were very nervous about this bill whenever we started discussion on it. They were nervous about losing revenue from the cable companies. And is there protection in this bill so that the communities do not lose revenue?

PRESIDING OFFICER: (SENATOR LINK)

Senator Clayborne.

SENATOR CLAYBORNE:

Yes, there is.

-------------------------------------------------------------------------

16

IL S. Tran. 2007 Reg. Sess. No. 57, Senate Transcript, 95th General Assembly, Regular Session, 57th Legislative Day, June 19, 2007, Illinois Senate 95th General Assembly

The protection for communities is the private right of actions for municipalities.  There is no need, as the lower court ruled, to inquire into other states' statutes regarding an Illinois unit of local government's authorization under the CCVL. Without a private right of action, local governments would be entirely reliant upon a third-party, the State, to bring an action to collect their 5% fee. But the Attorney General was not given this authority to bring an action in the City's favor. The CVCL specifically authorizes the Attorney General to bring an action in a court of competent jurisdiction in the name of the People of the State against the holder to obtain temporary, preliminary, or permanent injunctive relief and civil penalties for any act, policy, or practice by the holder that violates this Article (220 ILCS 5/21-1301 (c), for the Cable and Video Consumer Protection Law (220 ILCS 5/22-501 *et seq.*) of this Act, or the Consumer Fraud and Deceptive Business Practices Act. (815 ILCS 505/1 *et seq*.  Unless local governments like the City can seek the fees they are owed, they must depend on the limited bandwidth of the Attorney General's staff to obtain this recovery. In *Creve Coeur v. Netflix, et al.,* the St. Louis County, Missouri district court judge found that Creve Coeur did not have an adequate remedy at law and denied the defendants' motion to dismiss. *Creve Coeur v. Netflix, et al.*, 18SL-CC02819 (12/30/2020).

The district court improperly relied on rulings in lawsuits brought by other cities, in other states, seeking other relief against the Streaming Companies. In these cases, the plaintiffs sought relief that the companies cure their noncompliance or stop providing services whatsoever: *City of Reno, Nevada v. Netflix, Inc.*, 558 F. Supp. 3d 991, 997–1000 (D. Nev. 2021) (city requested Defendants to cure their noncompliance with N.R.S. § 711.670); *City of Ashdown, Arkansas v. Netflix, Inc.*, 565 F. Supp. 3d 1111, 1116–17 (W.D. Ark. 2021) (city requested Defendants to cure their noncompliance with Ark. Code Ann. §23-19-203 and Ark.Code Ann. §23-19-206); *City of*

*New Bos., Texas v. Netflix, Inc.*, 565 F. Supp. 3d 865, 869–70 (E.D. Tex. 2021) (city asked that Defendants to cure their noncompliance with Tex. Util. Code Ann. § 66.005(a)); *City of Lancaster v. Netflix*, No. 21STCV01881, 2021 WL 4470939, at *2–5 (Cal. Superior Ct., Sep. 20, 2021) (city asked defendants to cure their noncompliance with the California Public Utilities Code); *Gwinnett County, Georgia v. Netflix, Inc.*, No. 20-A-07909-10, 2022 WL 678784, at *3 (Ga. Superior Ct. Feb. 18, 2022) (county asked to enjoin and restrain defendants from engaging in business within the boundaries of class members and deriving gross revenues therefrom); *Borough of intern v. Netflix, Inc.*, No. CV-21-15303-SRC-MAH, 2022 WL 1617740, at *2–3 (D.N.J. May 20, 2022) (borough asked for the defendants to cure their noncompliance with N.J. Stat.Ann. § 48:5A-16 and N.J. Stat. Ann. § 48:5A-30); *City of Kenner v. Netflix, Inc. and Hulu, LLC*, Case No. 814-168, 2022 WL 4101746 (24th Judicial Dist., Parish of Jefferson, LA Aug. 25, 2022), (city asked that defendants be enjoined and retrained in business within the boundaries of Plaintiff and class members and deriving gross revenues therefrom without paying the required fees.) Following the district court's MTD Order, two state supreme courts joined this trend, but in both cases, the cities sought remedies which the courts ruled exceeded the scope of the statute: *City of Maple Heights v. Netflix, Inc., et al.,* 2022 WL 17331374 (Ohio 2022) (city requested defendants cure their noncompliance with O.R.C. § 1332.32) and the *City of Knoxville v. Netflix, Inc.,* 656 S.W.3d 109 (Tenn 2022) (city requested defendants cure their non-compliance with Tenn. Code Ann. § 7-59-306).

The district court lumped this action in with those other cases without considering that the relief requested by the City here is different – the City simply seeks the payment of fees. The Illinois Attorney General cannot pursue any payment of the 5% gross revenue due the local government. See 330 ILCS 5/21-1301. Therefore, the "[T]he applicable question ... is whether the

statute provides for a sufficient remedy, not whether a particular person or entity has, in fact, been sanctioned under the statute." *Carmichael v. Pro. Transportation, Inc.,* 2021 WL 3925613, at *7 (Ill. App. Ct. 2021), *appeal denied*, 451 Ill.Dec. 433, 183 N.E.3d 890 (Ill. 2021).

IV.     *The District Court Committed Reversable Error when it Concluded that the City did not Allege a Physical Trespass in the Amended Complaint*

The City's case is also distinguishable from the pool of cases relied upon by the district court because the City is the only plaintiff in these litigations which has included common law remedies. As alleged in the complaint, the Streaming Companies have entered into paid interconnection agreements with existing holders to access the public rights of ways, install and connect their own equipment to connect to its servers and stream their content faster to consumers. (Amended Complaint ¶¶6, 63-69 footnotes 22, 23, 24.) These interconnection agreements allow the Streaming Companies to connect with servers in its data centers skirting their obligation to pay a video service provider fee of 5% of their gross revenues derived from providing such video service in Illinois. (Id. ¶¶63-69.) Precious revenue necessary to fund the critical government infrastructure that provides for the health, safety and welfare of Illinois residents is at risk, purely to line the pockets of the Streaming Companies. (Omni to MTD, Page 54.)

The Streaming Companies "vigorously contest that they are subject to the CVCL." (MTD Order, page 7.) If the Streaming Companies are not holders and have no authorization from local government, they have trespassed onto the public rights of ways by "interconnecting" with the wireline facilities in the rights of ways and not paying compensation to local government holding this property for the public trust. To be clear, the City alleges that the interconnection service is a physical invasion of the rights of ways and that the transmission of Defendants' video content through the ISPs' wirelines constitutes a trespass. (Amended Complaint, page 11, heading C

through page 69.) Under Illinois law, a trespass is committed by entering, or causing a thing or third person to enter, land possessed by someone else without permission, invitation, or other right. *Dial v. City of O'Fallon*, 81 Ill.2d 548, 44 Ill.Dec. 248, 411 N.E.2d 217, 220 (1980); *Schweihs v. Chase Home Fin. LLC*, 453 Ill.Dec. 458, 187 N.E.3d 1196, 1207 (Ill. App. Ct. 2021) (citing *Benno v. Cent. Lake Cnty. Joint Action Water Agency*, 242 Ill.App.3d 306, 182 Ill.Dec. 522, 609 N.E.2d 1056, 1061 (1993)). *Desnick v. Am. Broad. Cos., Inc.,* 44 F.3d 1345, 1351 (7th Cir. 1995) ("To enter upon another's land without consent is a trespass."). It is "an invasion 'of the exclusive possession and physical condition of land.' " *Colwell Systems, Inc. v. Henson,* 117 Ill.App.3d 113, 72 Ill.Dec. 636, 452 N.E.2d 889, 892 (1983) (quoting Restatement (Second) of Torts, ch. 7, at 275 (1965)). The plaintiff must also allege "a wrongful interference with his actual possessory rights in the property." *Loftus v. Mingo,* 158 Ill.App.3d 733, 110 Ill.Dec. 368, 511 N.E.2d 203, 210 (1987); *accord Great Atl. & Pac. Tea Co., Inc. v. LaSalle Nat. Bank,* 77 Ill.App.3d 478, 32 Ill.Dec. 812, 395 N.E.2d 1193, 1196 (1979). "[T]he intrusion has to be such as to subtract from the owner's use of the property." *Geller v. Brownstone Condominium Assoc.,* 82 Ill.App.3d 334, 37 Ill.Dec. 805, 402 N.E.2d 807, 809 (1980)

In the early to mid-2000's, numerous individual and class action complaints were filed across the country against fiber optic companies for trespass to rights of ways arising out of common law and many of these cases were decided by the Seventh Circuit. *McDaniel v. Qwest Communications Corp*,  2006 WL 1476110 (N.D.IL 2006), Peeler v. MCI, Inc., 447 F.3d 992 (7th Cir. 2006), *Uhl v. Thoroughbred Technology and Telecommunications, Inc.*, 309 F.3d 97853 Fed.R.Serv.3d 1475 (7th Cir. 2002), Smith v. Sprint Communications Co., L.P., 387 F.3d 61234 Communications Reg. (P&F) 314 (7th Cir. 2004),  *Isaacs v. Sprint Corp.,* 261 F.3d 679 (7th Cir.2001),  *Zografos v. Qwest Communications Corp.,* 225 F.Supp.2d 1217, 1223 (D. Or. 2002).

20

Many of these cases involved trespass claims against MCI Worldcom, which placed fiber optic cables on former railroad rights of ways. While MCI's discharge in bankruptcy resolved prefiling trespass claims, (See *International Paper Co. v. MCI WorldCom Network Services, Inc.,* 442 F.3d 633 (8th Cir.2006)),  the claims in *Peeler v. MCI, Inc*., 447 F.3d 992 (7th Cir. 2006) of differed in that MCI had installed a "fiber box" on land in which Peeler asserts an interest and that should MCI should use the box in the future to access the underground cable then the repair teams would therefore re-enter Peeler's land and MCI lacked Peeler's consent. Cf. *Leo Sheep Co. v. United States,* 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979).

Here, the district court was incorrect when it found that "the complaint concedes that Defendants have not and do not install, operate, or maintain any physical infrastructure in the public rights-of-way" (*see* Doc. 167, ¶60; *see also* Doc. 184, p. 3 n.2). To the contrary, the City alleged that the Streaming Companies store their video content on servers either within or directly connected to the private network facilities of a local internet service provider ("ISP"). ISPs rely on wireline facilities located in public rights of way. Defendants then deliver their content to subscribers directly through a local ISP to subscriber connections through wireline facilities located in the public right of way. (Amended Complaint ¶35-69). In order to access the wireline facilities, the Streaming Companies have entered into private interconnection agreements to link their servers with the local IP. The nature of these agreements is not publicly available, but Netflix in particular, makes it clear that their servers are connected to insure effective streaming to consumers.

The district court mischaracterized the  Streaming Companies' conduct as alleged in the complaint, stating that "Defendants are not the ones putting wires and cables under streets or on poles (Amended Complaint  ¶60)." Rather, the complaint makes clear that it is the Internet Service

Providers ("ISPs") who construct, install, and/or operate the physical infrastructure (*i.e.*, wireline facilities) in the public rights-of-way that provide internet access to customers (Amended Complaint  ¶¶35, 39, 47, 52, 60). Defendants' video content is then transmitted across the ISPs' wireline facilities to subscribers (Id. at ¶¶35, 39, 47, 58, 102).

The district court cited *City of Chicago v. F.C.C.*, 199 F.3d 424, 433 (7th Cir. 1999) in support of the dismissal of the City's common law count of trespass (MTD Order at 9 page). However, that case involved the *satellite broadcast* (satellite master antenna television system (SMATV), of video using equipment solely on private property which is not alleged in the instant case by the City. There is no allegation of equipment solely on private property. In *Chicago*, Judge Rover questioned the majority ruling pointing out "for the purpose of transmitting its programming to those subscribers, ECI has installed and maintained ownership of some equipment (the headend, the junction boxes, and the interior building drop lines), while leasing other equipment (one strand of Ameritech's twelve-strand cable). ECI had, in this way, assembled the components of a functioning cable service. It did not construct and does not own all of those components, but it is nonetheless *responsible* for those it does not own by subscribing to Ameritech's Supertrunking Video Service." (*Chicago* at 434). Judge Rovner concluded that, despite there being no direct physical connection between ECI and Ameritech's equipment… "B(b)because ECI's leasing of Ameritech's lines for the purpose of transmitting its programming surely constitutes a "use" of the public way in ordinary parlance." *Chicago* at 436. Here, the Streaming Companies are alleged to have (1) connected their servers to local ISPs which exist in the public rights of way and (2) transmit their video content through equipment, not satellite broadcast.

Not only have the Streaming Companies trespassed by interconnecting to the rights of ways, but they continue to stream their video content. The district court improperly concluded,

without evidence to support such conclusion, that videos are not a "thing" and are comparable to electromagnetic radiation, radio, and infrared waves. (MTD Order at 10.) See *In re Definition of a Cable Television Sys.,* 5 FCC Rcd. 7638, 7642 (1990)) *Primeco Pers. Commc'n v. Ill. Commerce Comm'n*, 196 Ill.2d 70, 255 Ill.Dec. 621, 750 N.E.2d 202, 216 (2001). Certainly, a video can be purchased, can be downloaded, takes up space on a computer or hard drive, and can be bought and sold. (OMNI Response at p. 69). *Labell v. City of Chicago*, 439 Ill.Dec. 57, 147 N.E.3d 732 (Ill. App. Ct. 2019), *petition for leave to appeal denied*, 437 Ill.Dec. 585, 144 N.E.3d 1175 (Ill. 2020). In *Labell*, taxpayers brought a class action against the City of Chicago challenging the constitutionality of an ordinance imposing an "amusement tax" as it related to internet based streaming services (including Netflix, Hulu, Spotify, and Amazon Prime) delivered to customers with a Chicago address. 439 Ill.Dec. 57, 147 N.E.3d at 737–38. The Illinois appellate court upheld the amusement tax as constitutional. *Id.*, 439 Ill.Dec. 57, 147 N.E.3d at 747, 749.

Streaming Companies have chosen not to apply to the Illinois Commerce Commission to stream their content and are thus subject to local authority over their trespass on the public rights-of-ways located within the State of Illinois. The corporate authorities of each unit of local government may regulate the use of the streets and other municipal property. Cities and villages are authorized to regulate and control use of their streets including the right to grant to or to withhold such use from utilities. *City of Geneseo v. Illinois Northern Utilities Co.*, 39 N.E.2d 26, 378 Ill. 506, (1941) *certiorari denied* 62 S.Ct. 1046, 316 U.S. 670, 86 L.Ed. 1746.  For example, a municipal corporation was authorized to impose a rental on poles of telegraph or telephone companies not holding under an irrevocable franchise. *City of Springfield v. Postal Telegraph-Cable Co.*, 97 N.E. 672, 253 Ill. 346 (1912). The regulation and control of electric light companies in respect to their use of streets and the erection and construction of appliances is within the police

power delegated by the state to municipal corporations. *Commonwealth Electric Co. v. Rose*, 73 N.E. 780, 214 Ill. 545 (1905).

Streaming Companies have entered upon the property of the City and other putative class members without legal authority. The Streaming Companies have committed the tort of trespass by entering onto a City's land without permission, invitation, or other right. *Benno v. Central Lake County Joint Action Water Agency*, 242 Ill. App. 3d 306, 313, 182 Ill.Dec. 522, 609 N.E.2d 1056 (1993).

V.     *The City has Stated a Claim for Unjust Enrichment under Illinois law.*

Because the City has sufficiently alleged its trespass claims, this Court should reverse the district court's order dismissing the Unjust Enrichment claim. The Streaming Companies profit derive from trespass on the public rights of ways should be redressed by a cause of action based upon that improper conduct. *In re: Clearview AI, Inc., Consumer Privacy Litigation*, 2022 WL 444135 (N.D. Ill, Eastern Div. February 14, 2022) quoting *Toushin v. Ruggiero*, 2021 IL App (1st) 192171, ¶ 80, 2021 WL 2718495, at *13 (1st Dist. 2021) (quoting *Mulligan v. QVC, Inc.,* 888 N.E.2d 1190, 1200, 321 Ill.Dec. 257, 267, 382 Ill.App.3d 620, 631 (1st Dist. 2008)). "[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim     will     be     tied     to     this     related     claim—and,     of course, unjust enrichment will stand or fall with the related claim." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011). For the City here, that related claim is trespass and the district court erred when it dismissed the City's unjust enrichment claim with prejudice.

VI.     *The District Court Erred when it Dismissed the City's Ordinance Claim by Applying the Standard for Third Parties Seeking to Use a City Code as a Private Right of Action*

The district court improperly dismissed Count V of the First Amended Complaint to enforce a local ordinance. In engaging in an analysis whether there existed a private right of action

under the East St. Louis Municipal Code, the district court improperly used information outside of the complaint to inquire as to the purpose of this Code and concluded that "as defendants point out, it appears this ordinance was enacted in 1983 to address the theft of cable service, which was a widely recognized problem in the late 1970s and early 1980s (Doc. 179, p. 47). *See* H.R. Rep. No. 98-934, at *83 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4720 ("The Committee is extremely concerned with a problem which is increasingly plaguing the cable industry—the theft of cable service."); 1 Daniel L. Brenner et al., Cable Television and Other Nonbroadcast Video § 5:82 (2022) (indicating theft of service in the cable industry was a problem in the 1980s, estimated to cost cable companies over $500 million a year in 1984).

In construing the validity of a municipal ordinance, the same rules are applied as those that govern the construction of statutes. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306, 322 Ill.Dec. 548, 891 N.E.2d 839 (2008). The Court must determine and give effect to the legislating body's intent as shown by the ordinance's plain and ordinary language. *Scott v. City of Chicago*, 2015 IL App (1st) 140570, ¶ 11, 390 Ill.Dec. 660, 29 N.E.3d 592; *McGrath v. City of Kankakee*, 2016 IL App (3d) 140523, ¶ 21, 403 Ill.Dec. 864, 55 N.E.3d 51. In doing so, the Court must view the ordinance as a whole, including other relevant provisions. *Crittenden v. Cook County Comm'n on Human Rights*, 2012 IL App (1st) 112437, ¶ 81, 362 Ill.Dec. 308, 973 N.E.2d 408.

East St. Louis Municipal Code §82-19 prohibits the resale of cable communication signals or service within the city without, prior to such sale, having obtained written consent and approval of both the operating franchise company and the city. (Ord. No. 83-10033, § II, 9-21-1983). The immediately following East St. Louis code, §82-20 includes the definition of "cable television service" as follows:

Cable television service means any and all services provided by or through the facilities of any cable television or closed-circuit coaxial cable communication system, or any microwave or similar transmission service used in connection with any cable television system or similar closed-circuit coaxial cable communication system. (Ord. No. 83-10033, §§ III, V, 9-21-1983)

The case cited by the district court involved a third party seeking to enforce a city's code against a purported violator. *1541 N. Bosworth Condo. Ass'n v. Hanna Architects, Inc.,* 2021 WL 6135459, (Ill. App. Ct. 2021) *appeal denied*, 453 Ill.Dec. 251, 187 N.E.3d 704 (Ill. 2022) (involving a condominium association seeking to enforce a building code). Here, the City itself has plead that the Streaming Companies have purchased cable communication from the holders through their interconnection agreements and have subsequently sold that cable communication to it subscribers, all without the permission of the City, as required by the Code.

The City has complied with the pleading of an ordinance violation as required by the Illinois Supreme Court Rule 522, which provides that the citation include the nature of the offense and a reference to the relevant ordinance. Illinois Supreme Court Rule 572. To complete its allegations, the City has further plead that each resale is subject to a maximum $750 penalty pursuant to §1-15 of the East St. Louis Municipal Code. The City has placed the Defendants on notice that they are charged with the unauthorized resale of City property, stated all necessary requirements for an ordinance violation as required by the Illinois Supreme Court, Rule 572, Form of Charging Instrument. That rule requires that the charging instrument contain the nature of the offense and the reference to the relevant ordinance. Illinois Supreme Court Rule 572 (a)(4). The City further alleged a prayer for relief pursuant to Illinois Supreme Court Rule 572 (d). Accordingly, under Illinois substantive and procedural law, all of the pleading requirements have

been met by the City and the district should not have dismissed Count V of the Amended Complaint.

CONCLUSION

For those reasons stated above, the City respectfully requests that this Court vacate the district court's September 23, 2022 order dismissing the City's Amended Complaint and remand this matter to the district court for further proceedings.

Respectfully submitted,

CITY OF EAST ST. LOUIS

*/s/ Melissa K. Sims*
Melissa K. Sims
Marc D. Grossman
Greg Coleman
Daniel K. Bryson
Patrick M. Wallace
James DeMay
Vicki J. Maniatis
Andrew A. Lemmon
Milberg Coleman Bryson Phillips Grossman, PLLC
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
(800) 530-9800
mgrossman@milberg.com
msims@milberg.com
gcoleman@milberg.com
dbryson@milberg.com
pwallace@milberg.com
jdemay@milberg.com
vmaniatis@milberg.com
alemmon@milberg.com

Roy L. Mason
Zachery E. Howerton
Smouse & Mason, LLC
223 Duke of Gloucester Street
Annapolis, MD 21401
410-269-6620

Fax: 410-269-1235
zeh@smouseandmason.com

John J. Driscoll
Driscoll Firm, LLC
1311 Avenida Juan Ponce de Leon
6th Floor
San Juan, PR 00907
618-444-6049
Fax: 314-932-3233
john@jjlegal.com

John Baricevic
Charles J Baricevic
Chatham & Baricevic
107 West Main Street
Suite 1
Belleville, IL 62220
618-233-2200
Fax: 618-233-1589
cj@chathamlaw.org

CERTIFICATE OF COMPLIANCE WITH
FRAP RULE 32(a)(7), FRAP RULE 32(g) and CR 32(c)

The undersigned, counsel of record for the Plaintiff-Appellant, the City of East St. Louis,

Illinois,  furnishes the following in compliance with F.R.A.P Rule 32(a)(7):

I hereby certify that this brief conforms to the rules contained in F.R.A.P Rule 32(a)(7)

for a brief produced with a proportionally spaced font. The length of this brief is 8,194 words.

Dated: February 4, 2023

Respectfully submitted,

CITY OF EAST ST. LOUIS

*/s/ Melissa K. Sims*
Melissa K. Sims
Milberg Coleman Bryson Phillips Grossman, PLLC
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
(800) 530-9800
msims@milberg.com

PROOF OF SERVICE

The undersigned, counsel for the Plaintiff-Appellant, the City of East St. Louis, Illinois, hereby certifies that on February 13, 2023, two copies of the Corrected Brief and Required Short Appendix of Appellant and one copy of the Separate Appendix as well as a digital version containing the brief, were delivered by Melissa K. Sims, to counsel for the Defendants-Appellees, Netflix, Inc., Disney Platform Distribution, Inc., Apple Inc., Hulu LLC, WarnerMedia Direct, LLC, Amazon.com Services, LLC, CBS Interactive Inc., Youtube LLC, CuriosityStream, Inc., Peacock TV, LLC, DirecTV, LLC, and DISH Network, LLC. Dated February 4, 2023.

Respectfully submitted,

CITY OF EAST ST. LOUIS

*/s/ Melissa K. Sims*
Melissa K. Sims
Milberg Coleman Bryson Phillips Grossman, PLLC
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
(800) 530-9800
msims@milberg.com

CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the appendix.

See also:

Circuit Rule 30(a)

Circuit Rule 30(b)

and

*United States v. Rogers*, 270 F.3d 1076, 1084 (7th Cir. 2001);

*In re Mix*, Disciplinary Case D-134, 901 F.2d 143 (7th Cir. 1990);

*Mortell v. Mortell*, 887 F.2d 1322 (7th Cir. 1989).


February 4, 2023

Respectfully submitted,

CITY OF EAST ST. LOUIS

*/s/ Melissa K. Sims*
Melissa K. Sims
Milberg Coleman Bryson Phillips Grossman, PLLC
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
(800) 530-9800
msims@milberg.com

ATTACHED REQUIRED SHORT APPENDIX

TABLE OF CONTENTS

City of East St. Louis Amended Complaint…………………………………………………………33

September 23, 2022 Order Granting Defendants' Motion to Dismiss……………………………75

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

CITY OF EAST ST. LOUIS, individually and
on behalf of all others similarly situated,

    Plaintiff,

  v.

NETFLIX, INC., DISNEY PLATFORM
DISTRIBUTION, INC., APPLE INC., HULU, LLC,
WARNERMEDIA DIRECT, LLC,
AMAZON.COM SERVICES, LLC, CBS
INTERACTIVE INC., YOUTUBE LLC,
CURIOSITYSTREAM, INC., PEACOCK TV, LLC,
DIRECTV, LLC, and DISH NETWORK, LLC

    Defendants.

Case No.: 2021-CV-00561

MAB

*Jury Trial Demanded*

---

**AMENDED CLASS ACTION COMPLAINT**

Plaintiff **City of East St. Louis** ("Plaintiff" or "East St. Louis"), individually and on

behalf of all others similarly situated (the "Class," as more fully defined below), brings

this action for declaratory judgment and other relief against Defendants **Netflix, Inc.,**

**Disney Platform Distribution, Inc., Apple Inc., Hulu, LLC, WarnerMedia Direct, LLC,**

**Amazon.com Services, LLC, CBS Interactive Inc., YouTube LLC, CuriosityStream, Inc.,**

**Peacock TV, LLC, DirecTV, LLC, and Dish Network, LLC** (collectively "Defendants")

and for its Amended Petition, states as follows:

I.   **INTRODUCTION**

1.      Since 2007, the Cable and Video Competition Law of 2007 (the "Act"), 220

ILCS 5/21-100 *et seq.*, has required providers of video service in Illinois to affirmatively

apply for and receive a video service authorization from the Illinois Commerce

Commission and pay video service provider fees to Illinois cities, villages, incorporated

towns, and counties.

2.      Defendants have and continue to provide video service in Illinois cities,

villages, incorporated towns, and counties. When doing so, Defendants transmit their

programming through wireline facilities located at least in part on public rights-of-way

within Illinois cities, villages, incorporated towns, and counties.

3.      However, rather than comply with the Act, Defendants evade their

statutory responsibilities and sidestep their obligations to pay video service provider fees

to Illinois cities, villages, incorporated towns, and counties.

4.      Accordingly, Defendants should be and are required by the Act to pay each

of those Illinois cities, villages, incorporated towns, and counties a video service provider

fee of up to 5% percent of their gross revenue, as derived from their providing video

service in each unit.

5.      Defendants have failed to pay the required fee, thereby necessitating this

Action, and entitling Plaintiff and the putative class to the relief requested herein.

## II.     <u>PARTIES</u>

4.     Plaintiff, the **City of East St. Louis, Illinois**, is a municipally chartered as a Home Rule Unit of local government pursuant to § 6 of Article VII of the Illinois Constitution and is duly authorized to bring this action.  As a chartered Home Rule Unit, East St. Louis exercises thereunder all powers of local self-government.

5.     Defendant Netflix, Inc. ("**Netflix**") is a Delaware corporation, headquartered in Los Gatos, California. Netflix's primary business is its video service, which offers online streaming of a library of films and television programs, as well as the distribution and production of original films and television series. Netflix does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

6.     Defendant Disney Platform Distribution, Inc. ("**Disney**") is a Delaware corporation, headquartered in New York, New York. Disney's primary business is its video service, Disney+, which offers online streaming of a library of films and television programs, as well as the distribution and production of original films and television series.

7.     Disney does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

8.     Defendant, Apple Inc. ("**Apple**") a Delaware corporation, headquartered in Cupertino, California. Apple's primary business is its video service, Apple TV+, which

offers online streaming of a library of films and television series. Apple does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

9.     Defendant Hulu, LLC ("**Hulu**") is a Delaware limited liability company, headquartered in Santa Monica, California. Hulu's primary business is its video service, which offers online streaming of live video programming and a library of films and television programs, as well as the distribution and production of original films and television series. Hulu does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

10.     Defendant, WarnerMedia Direct, LLC ("**Warner**") is a New York corporation, headquartered in New York City, New York. Warner's primary business is its video service, HBO Max, which offers online streaming of live video programming and a library of films and television programs, as well as the distribution and production of original films and television series. Warner does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

11.     Defendant, Amazon.com Services, LLC ("**Amazon**") is Delaware corporation, headquartered in Wilmington, Delaware. Amazon's primary business is its video service, Amazon Prime, which offers online streaming of live video programming and a library of films and television programs, as well as the distribution and production of original films and television series. Prime does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

12.     Defendant, CBS Interactive Inc. ("**CBS**") is a New York corporation headquartered in New York City, New York. CBS's primary business is its video service, Paramount+, which offers online streaming of live video programming and a library of films and television programs, as well as the distribution and production of original films and television series. CBS does business in East St. Louis, Illinois, and has done so at all times relevant to this action.[1]

13.     Defendant, YouTube, LLC ("**YouTube**") is a Delaware corporation, headquartered in San Bruno, California. YouTube's primary business is its video service, YouTube Premium, which offers online streaming of live video programming and a library of films and television programs, as well as the distribution and production of original films and television series.  YouTube does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

14.     Defendant, CuriosityStream, Inc. ("**CuriosityStream**") is a Delaware corporation headquartered in Silver Spring, Maryland. CuriosityStream's primary business is its video service, which offers online streaming of live video programming and a library of films and television programs, as well as the distribution and production of original films and television series. CuriosityStream does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

---

[1] Megan Graham, *CBS All Access streaming service is getting a new name: Paramount+*, CNBC (Sept. 15, 2020), https://www.cnbc.com/2020/09/15/cbs-all-access-rebranded-as-paramount-plus-.html.

15.     Defendant, PeacockTV, LLC ("**Peacock**") is a Delaware corporation headquartered in New York, New York. Peacock's primary business is its video service, which offers online streaming of live video programming and a library of films and television programs, as well as the distribution and production of original films and television series. Peacock does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

16.     Defendant, DirecTV LLC ("**DirecTV**") is a Delaware corporation headquartered in El Segundo, California. DirecTV's primary business is its video service, which offers online streaming of live video programming and a library of films and television programs. DirecTV does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

17.     Defendant, DISH Network, L.L.C. ("**Dish**") is a Colorado corporation headquartered in Englewood, Colorado. Dish's primary business is its video service, which offers online streaming of live video programming and a library of films and television programs. Dish does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

## III.   <u>JURISDICTION AND VENUE</u>

18.     This Court has jurisdiction over this action in accordance with 28 U.S.C. §1332(a) and (d).  Defendants are citizens of different states from that of the Plaintiff, the

putative class size is greater than 100, and the aggregate amount in controversy for the proposed Class exceeds $5,000,000.00, exclusive of interest and costs.

19.     Venue is proper in this District, and this Court has personal jurisdiction over Defendants, pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendants transact affairs in this District; each Defendant continuously and systematically engaged in and continues to engage in business in this District.

## IV.   FACTUAL ALLEGATIONS

*A. Statutory Authority to Bring this Action: 220 ILCS 5/21-100 et seq.*

20.     In order to offer or provide video service in Illinois, an entity is required under the Act to obtain a "State-issued authorization." 220 ILCS 5/21-401.

21.     The Act defines "video service" as "**video programming** and subscriber interaction, if any, that is required for the selection or use of such video programming services, and **that is provided through wireline facilities located at least in part in the public rights-of-way without regard to delivery technology, including Internet protocol technology**…" 220 ILCS 5/21-201(v) (emphasis added).[2]

---

[2] The definition of "video service" continues as follows: "This definition does not include any video programming provided by a commercial mobile service provider defined in subsection (d) of 47 U.S.C. 332 or any video programming provided solely as part of, and via, service that enables users to access content, information, electronic mail, or other services offered over the public Internet."

22.     The Act further defines "video programming" by incorporating the definition set out in 47 U.S.C. § 522(20): "the term 'video programming' means programming provided by, or generally considered comparable to programming provided by, a television broadcast station." *See* 220 ILCS 5/21-201(u).[3]

23.     Pursuant to the Act, an entity shall not use the public rights-of-way for the installation or construction of facilities for the provision of video service, or offer video service, until it obtains the State-issued authorization for the entity to offer and provide video service. *See* 220 ILCS 5/21-401(a)(1).

24.     In order to obtain the State-issued authorization, the entity must, submit an application that includes, among other things, an affidavit of an officer of the entity to: (1) certify that the entity has filed or will timely file all relevant forms required by the Federal Communications Commission; (2) certify that the entity will comply with all applicable federal and State statutes and regulations; **(3) certify that the entity will comply with all applicable local government regulations**; (4) provide an exact description of where the video service will be offered; (5) provide the location and telephone number of the entity's principal place of business and the names of the entity's principal executive officers responsible for the video services to be offered; **(6) certify that**

---

[3] In 1992, the Federal Communication Commission ("FCC") interpreted that the definition of "video service" refers to what constituted broadcast television programming in 1984. 7 FCCR cd. 5781 at ¶74 (1992). While such programming is usually linear and multichannel, the FCC has determined that "video-on-demand images can be severed from the interactive functionalities and thereby constitute video programming." 10 FCC Rcd. 244 at ¶¶103–111(1994).

**the applicant has concurrently delivered a copy of the application to all local units of government that include all or part of the service area where the video service will be offered**; and (7) identify the expected date that video service will be offered in the area. *See* 220 ILCS 21-401(b).

25.　　Once the entity is granted the State-issued authorization, prior to offering video service in a local government's jurisdiction, the entity must affirmatively notify a local government of its intent to offer video services within the local government's boundaries at least 10 days prior to offering such video service. *See* ILCS 5/21-801(a).

26.　　Upon notice by the entity that it intends to offer video service within the local government's boundaries, the local government shall adopt an ordinance requiring the entity to pay a "service provider fee" to the local government. Upon adoption, the local government shall mail a copy of the ordinance to the entity at the address it listed on its application. *See* 220 ILCS 5/21-801(b).

27.　　The entity providing video service is then required to pay a "service provider fee" which shall be 5% of "gross revenues", defined as "all consideration of any kind or nature, including, without limitation, cash, credits, property, and in-kind contributions received by the holder for the operation of a cable or video system to provide cable service or video service within the holder's cable service or video service area within the local unit of government's jurisdiction." *See* 220 ILCS 5/21-801(b)-(c).

28.     The Act's authorization process and other standards, including the service provider fee to the local government, are intended to, *inter alia*, benefit the Plaintiff and other Illinois municipalities by providing new infrastructure investment, job growth, and innovation in broadband and Internet protocol technologies and deployment.[4]

29.     The Act provides the Plaintiff and other Illinois municipalities the right to enforce applicable rights and obligations, including the Defendants' obligation to apply for and receive a video service authorization and pay video service provider fees to the Plaintiff and other Illinois municipalities in which they provide video service prior to performing such video service.[5] *See* 220 ILCS 5/21-1301.

**B. Defendants Provide Video Programming.**

30.     Defendants provide video programming to their subscribers to view television shows, movies, and documentaries.

---

[4] Pursuant to 220 ILCS 5/21-201(f), "The State authorization process and uniform standards and procedures in this Article are intended to enable rapid and widespread entry by competitive providers, which will bring to Illinois consumers the benefits of video competition, including providing consumers with more choice, lower prices, higher speed and more advanced Internet access, more diverse and varied news, public information, education, and entertainment programming, and will bring to this State and its local units of government the benefits of new infrastructure investment, job growth, and innovation in broadband and Internet protocol technologies and deployment."

[5] *See* 220 ILCS 5/21-1301 ("nothing in this Article shall deprive local units of government of the right to enforce applicable rights and obligations."); *see also* 220 ILCS 5/21-901 ("A holder that has received State-issued authorization under this Article is subject to an audit of its service provider fees derived from the provision of cable or video services to subscribers within any part of the local unit of government which is located in the holder's service territory. Any such audit shall be conducted by the local unit of government or its agent for the sole purpose of determining any overpayment or underpayment of the holder's service provider fee to the local unit of government.").

31.     Defendants compete with other cable or video providers offering video programming.

32.     Defendants' video programming is comparable to that provided by television-broadcast stations and cable companies including, but not limited to, such areas as format, genre, and content.

33.     Each of the Defendants charge subscribers a fee to access their video programming from which they generate gross revenue.

34.     Defendants transmit video programming directly to subscribers located within the geographic boundaries of the State of Illinois, including the City of East St. Louis.

## C. Defendants' Video Programming is Transmitted through Wireline Facilities Located in the Public Rights-of-Way.

### i. *The Local ISP Connection.*

35.     Defendants store their video content either within or directly connected to the private network facilities of a local internet service provider ("ISP"). ISPs rely on wireline facilities located in Plaintiff's public rights of way.  Defendants then deliver their content to subscribers directly through a local ISP to subscriber connections through wireline facilities located in the public right of way.

36.     At first, ISPs generally offered dial-up connections, using the public telephone network to provide last-mile connections to their customers. Later, ISPs were accessed using cable television lines using broadband technology such as cable modems

and digital subscriber line (DSL). These lines and cables lie within the public rights of
ways of the Plaintiff and other Illinois municipalities.

37.    Customers view Defendants' video programming—such as television
shows, movies, and documentaries—using an internet-connected device. Internet-
connected devices are electronic devices that have software enabling them to stream
Defendants' video programming, including smart televisions, streaming media players
like Roku or Apple TV, tablets, smartphones, video game consoles, set-top boxes from
cable and satellite providers, Blu-ray players, and personal computers.

38.    None of the Defendants actually provide video programming solely as part
of and via service that enables users to access services over the public internet. This is
because Defendants' video programming is privately offered only to paying subscribers
private using content delivery networks to bypass the public internet.

39.    When a subscriber wants to watch the Defendants' video programming, he
or she uses an internet-connected device to send a request to their local ISP.  The ISP then
forwards that request to Defendants' dedicated servers that are part of Defendants'
private content delivery networks, which, in turn, provide a response. This response is
then relayed back to the subscriber's device, and Defendants deliver the video
programming via the ISP's private network facilities (i.e., broadband wireline facilities
located at least in part in public rights-of-way).

### ii. Netflix's Private Content Delivery Network.

40.     Defendant Netflix is an American video streaming provider. When a Netflix subscriber wants to view programming, the subscriber's ISP will connect the subscriber to the closest Netflix "Open Connect" server to offer the fastest speeds and best video quality. Netflix has placed Open Connect servers in nearly 1,000 separate locations in the United States, and many of these servers are directly connected to a local ISP's network facilities.[6]

41.     Open Connect is the name of Netflix's private content delivery network that is responsible for delivering Netflix TV shows and movies to its members world-wide.[7] Open Connect is an open-source software application for connecting to virtual private networks (VPN), which implement secure point-to-point connections, or "Content Delivery Network"[8] ("CDN") because its job is to deliver streaming content efficiently by bringing the content that people watch close to where the subscriber is watching it.

---

[6] Michelle Clancy, *Netflix Moves All Global Traffic to Open Connect CDN*, RAPID TV NEWS (Mar. 19, 2016), https://www.rapidtvnews.com/2016031942170/netflix-moves-all-global-traffic-to-open-connect-cdn.html#axzz6m1ipHAmz.

[7] Netflix, *Open Connect Overview*, NETFLIX, INC. (2019), https://openconnect.netflix.com/Open-Connect-Overview.pdf.

[8] A content delivery network, or content distribution network (CDN), is a geographically distributed network of proxy servers and their data centers. The goal is to provide high availability and performance by distributing the service spatially relative to end users. CDNs came into existence in the late 1990s as a means for alleviating the performance bottlenecks of the Internet. Erik Nygren, et al., *The Akamai Network: A Platform for High-Performance Internet Applications*, AKAMAI TECHNOLOGIES 1, 2–19 (Sept. 13, 2012), https://www.akamai.com/us/en/multimedia/documents/technical-publication/the-akamai-network-a-platform-for-high-performance-internet-applications-technical-publication.pdf.

**Content Delivery Network**



42.     In 2011, Netflix began its Open Connect initiative as a response to the ever-

increasing scale of Netflix streaming, it stated, for two reasons:

  a)  As Netflix grew to be a significant portion of overall traffic on consumer
      Internet Service Provider (ISP) networks, it became important to be able to
      work with those ISPs in a direct and collaborative way; and

  b)  Creating a content delivery solution customized for Netflix to design a
      proactive, directed caching solution that is much more efficient than the
      standard demand-driven CDN solution, reducing the overall demand on
      upstream network capacity by several orders of magnitude.[9]

43.     In order to accomplish these tasks, Netflix created Open Connect

Appliances ("OCA") which store Netflix's video content.  OCAs are purpose-built server

---

[9] Netflix, *Open Connect Overview*, NETFLIX, INC. (2019), https://openconnect.netflix.com/Open-Connect-Overview.pdf.

appliances which store encoded video/image files and serve these files to client devices
(for example: set top boxes, mobile devices, or smart TVs) using the local ISP's private
network facilities. OCAs have the sole responsibility of delivering playable bits to client
devices as fast as possible. [10]



11

44.     Netflix provides the OCAs to qualifying internet service providers and the
OCAs are then deployed directly inside the ISP networks. The internet service provider
partner uses the OCA to provide video content to its Netflix subscribers. Close to 90% of

---

[10] *Id.*

[9] Netflix, *Open Connect Overview*, NETFLIX, INC. (2019), https://openconnect.netflix.com/Open-Connect-Overview.pdf.

Netflix's global traffic is delivered via these direction connections between OCAs and the ISPs.[12]

45.     According to Netflix, that means that most of its subscribers receive Netflix's video programming from servers either inside of, or directly connected to, the subscriber's internet service provider's network within their local region. Netflix has "end-to-end" control of its entire Open Connect system, including any servers located in East St. Louis and/or other Illinois municipalities and/or counties.

> ### iii. Other Defendants also use ISP and Private Content Delivery Networks to Stream Video Content.

46.     Similar to Netflix, when streaming subscribers want to view the other Defendants' video programming, the subscriber's Internet service provider will connect the subscriber to the Defendants' private content delivery networks.

47.     These Defendants receive the directive and check the subscriber's entitlement, the location, and the content availability. They then deliver the program to the subscriber's internet-connected device via the internet provider's private network facilities. These Defendants place video content onto servers in their private content delivery networks either inside of or directly connected to an internet service provider, and from there, the internet service provider directly delivers the content to a customer.

---

[12] Ken Florance, *How Netflix Works With ISPs Around the Globe to Deliver a Great Viewing Experience*, NETFLIX (Mar. 17, 2016), https://about.netflix.com/en/news/how-netflix-works-with-isps-around-the-globe-to-deliver-a-great-viewing-experience.

### *iv. Defendants' Video Service is Not Provided Over the Public Internet.*

48.     Defendants' subscribers typically use a broadband internet connection such as DSL or fiber optic cable to receive Defendants' programming.

49.     For example, in East St. Louis, common providers of broadband internet include Spectrum, EarthLink, AT&T, MediaCom, Wisper, Frontier and others.

50.     Broadband internet connections rely upon wireline facilities located in whole or in part in the public right(s)-of-way to deliver internet service to subscribers.

51.     As a result of Defendants' subscribers using a broadband internet connection to receive Defendants' programming, Defendants operate and provide their video service to Defendants' subscribers through wireline facilities located, at least in part, in the public right-of-way.

52.     Defendants provide video content, not internet access. The "service that enables users to access content, information, electronic mail, or other services offered over the public Internet" is provided by the ISPs and is not part of the services provided by Defendants.[13]

53.     Additionally, subscribers pay for Defendants' video content. Requiring payment of a subscription fee to access content bypasses the public internet.

---

[13] Pursuant to 220 ILCS 5/21-201(v), the definition of "video service" does not include "any video programming provided solely as part of, and via, service that enables users to access content, information, electronic mail, or other services offered over the public Internet."

54.     The Defendants use CDNs that are specifically designed to bypass the public internet.

55.     Netflix uses Open Connect. Netflix has placed its Open Connect servers in over 1,000 locations across the globe, and many of these servers are directly connected to a local ISP's network facilities. When a Netflix subscriber wants to view Netflix video programming, they are connected to the nearest Netflix Open Connect server. In this way, Netflix delivers its content via its private CDN via the local ISP's private network facilities without using the public internet. According to Netflix, this means that "Even though millions of people around the world will be watching, there will be very little additional traffic on the 'internet' because of a decision we made in 2011 to build our own content delivery network, or CDN."[14]

56.     Hulu also delivers its video programming through CDNs that use private servers directly connected to a local ISP's privately owned network facilities, without using the public internet. Indeed, Hulu employs Amazon Web Services ("AWS") Direct Connect. [15] According to AWS, AWS Connect is "a network service that provides an alternative to using the Internet … AWS Direct Connect enables customers to have low

---

[14] *Id.*

[15] Allison Deal, *The Challenges of Live Linear Video Ingest — Part Three: Key Learnings*, Hulu Tech (September 27, 2018), The Challenges of Live Linear Video Ingest — Part Three: Key Learnings | by Hulu Tech | Hulu Tech blog | Medium.

latency, secure and private connections to AWS for workloads which require higher speed or lower latency than the internet."[16] According to Hulu:

> We noticed that performance of transferring media files from vendors on the opposite coast to our ingest service was not where we wanted it to be, utilizing public internet connections, which caused latency and unpredictable performance. To overcome this challenge, we worked closely with our vendors to setup AWS Direct Connect and establish private connections between vendors' publishing platforms and Hulu's ingest service. **This bypasses public internet, resulting in faster and more consistent file transfer speeds**.[17] (emphasis added).

57.     Upon information and belief, all of the Defendants deliver their video programming using private CDNs which are not part of the public internet. The Defendants place servers hosting their content throughout the country, including Illinois, so that they can be directly connected to ISPs' private network facilities without using the public internet.

58.     The Defendants' content-delivery systems operate by keeping the video programming within or directly connected to the private network of local ISPs, which rely upon wireline facilities located in whole or in part in the public right(s)-of-way, and that deliver the streaming content to subscribers.

---

[16] AWS, *Connect Your Data Center to AWS, Use AWS Direct Connect to securely link your on-premise environment to AWS*, https://aws.amazon.com/getting-started/projects/connect-data-center-to-aws/faq/.

[17] *Supra* fn. 23.

59.     Defendants' provision of video programming by the means above, in addition to requiring payment of a subscription fee to access its content, bypasses the public Internet.

60.     There are no requirements in the Act for Defendants to construct, own, or operate these wireline facilities. The wireline facilities can be owned and operated by a third party. Thus, it is of no consequence that Defendants do not place wires and cables under streets, because Defendants' subscribers use broadband internet connection, which employs DSL or fiber optic cable, to receive Defendants' programming. Indeed, the Act makes manifest that the construction and operation of facilities is conditional, as opposed to a requirement at the time of application.[18]

61.     In fact, the Act states that video service can both be provided and is provided through wireline facilities located at least in part in the public rights-of-way without regard to delivery technology, including Internet protocol technology.[19]

62.     As made manifest in the Act, the Illinois legislature intended the Act to apply to video service providers such as the Defendants, not simply cable companies.[20]

---

[18] *See* 220 ILCS 5/21-1001 ("if the holder installs, upgrades, constructs, operates, maintains, and removes facilities or equipment within a public right-of-way to provide cable service or video service, it shall comply with the following….").

[19] Pursuant to 220 ILCS 5/21-201(v), "Video service" means "video programming and subscriber interaction, if any, that is required for the selection or use of such video programming services, and that is provided through wireline facilities located at least in part in the public rights-of-way without regard to delivery technology, including Internet protocol technology."

[20] Pursuant to 220 ILCS 5/21-201, the legislative findings regarding video service are, *inter alia*, "investment in new communications, cable services, and video services infrastructure, including broadband facilities, fiber optic, and Internet protocol technologies," and "increasing consumer access to robust and reliable

### D. Defendants Skirt Illinois Law By Entering into Private Agreements with Broadband Providers.

63.     Upon information and belief, in order to provide faster video service to more consumers within Plaintiff's and other Class members' geographic areas, without Plaintiff's and other Class members' consent and approval, and without having to pay the required video service provider fees, some or all Defendants have entered into a number of paid private agreements with broadband providers in Plaintiff's and other Class members' geographic areas who do pay service provider fees.

64.     For example, on February 23, 2014, Netflix entered into an agreement with Comcast, the country's largest cable and broadband provider, in which Netflix will pay Comcast for faster and more reliable access to Comcast's subscribers.[21] Comcast will now bypass third-party distributors and connect directly to Netflix's own servers in its data centers.  While details were not disclosed, a source close to the companies said it involved annual payments of several million dollars.

---

broadband products" and "enable rapid and widespread entry by competitive providers, which will bring to Illinois consumers the benefits of video competition, including providing consumers with more choice, lower prices, higher speed and more advanced Internet access, more diverse and varied news, public information, education, and entertainment programming, and will bring to this State and its local units of government the benefits of new infrastructure investment, job growth, and innovation in broadband and Internet protocol technologies and deployment."

[21] Wyatt, Edward and Cohen, Noam *"Comcast and Netflix Reach Deal on Service"* New York Times, February 23, 2014, available at https://www.nytimes.com/2014/02/24/business/media/comcast-and-netflix-reach-a-streaming-agreement.html

65.     Since agreeing to pay Comcast, Netflix also has agreed to pay  Time Warner Cable[22], AT&T[23] and Verizon[24] for interconnection ("peering," in the vernacular.)

66.     Peering is a connectivity method where two networks establish a direct IP connection between their networks, bypassing any third-party networks or middlemen. There are several forms, including "paid peering", where two networks agree to exchange traffic directly, and compensation is involved.

67.     With these paid peering agreements, video service providers such as Netflix gain faster access to more consumers, and thus increase gross revenue, through direct connection to broadband providers which rely upon wireline facilities located in whole or in part in the public right(s)-of-way to deliver video streaming content to subscribers in Plaintiff's and other Class members' geographic areas.

68.     Upon information and belief, some or all Defendants have entered into paid peering agreements with broadband providers in Plaintiff's and other Class members' geographic areas, without providing Plaintiff and the other Class members with notice, or applying for authorization, and thus skirting their obligation to pay a video service

---

[22] Higginbotham, Stacey *"Netflix is now paying Time Warner Cable for direct access and faster streams"* www.gigaom.com, August 19, 2014, available at https://gigaom.com/2014/08/19/netflix-is-now-paying-time-warner-cable-for-direct-access-and-faster-streams/

[23] Wilhelm, Alex *"Netflix And AT&T Sign Peering Agreement"* www.techcrunch.com, July 29, 2014, available at https://techcrunch.com/2014/07/29/netflix-and-att-sign-peering-agreement/

[24] Wilhelm, Alex *"Netflix Inks Peering Deal With Verizon"* www.techcrunch.com April 28, 2014, available at https://techcrunch.com/2014/04/28/netflix-inks-peering-deal-with-verizon/

provider fee of 5% of their gross revenues derived from providing such video service in those counties and municipalities.

69.     These peering agreements are private and not available to the Plaintiff.

## V.     CLASS ACTION ALLEGATIONS

70.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff bring this action on behalf of itself, and a proposed Class initially defined as: "All Illinois cities, villages, incorporated towns, and counties in which one or more of the Defendants has provided video service (the 'Class')."[25]

71.     Excluded from the Class are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the Court staff assigned to this case and their immediate family members.

72.     Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

73.     This action has been brought and may properly be maintained on behalf of the Class.

74.     **Numerosity:** The proposed Class is sufficiently numerous that individual joinder of all Class members is impracticable. Indeed, the Class size is believed to be in excess of 1,298 municipalities and 102 counties. Class members may be notified of the

---

[25] Pursuant to 220 ILCS 5/22-501, "Local unit of government" means a city, village, incorporated town, or a county.

pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

75.   **Commonality and Predominance:** This action involves common questions of law and fact, which predominate over any questions affecting only individual Class members, including, without limitation:

a   Whether Defendants provide video service, as defined by 220 ILCS 5/21-201(b) of the Act, within Plaintiff's and the other Class members' geographic areas;

b   Whether Defendants are video service providers, as defined by 220 ILCS 5/21-201(h);

c   Whether Defendants were required to file an application with the Illinois Commerce Commission for a state issued certificate of pursuant to 220 ILCS 5/21-401;

d   Whether Defendants have failed to pay video service fees pursuant to 220 ILCS 5/21-801;

e   Whether Defendants have trespassed on Plaintiff's and other Class Members' rights of way;

f   Whether Defendants have trespassed onto property of the Plaintiff and other Class members and have been unjustly enriched through their use of the public rights of way owned and maintained by Plaintiff and the other Class members;

g   The appropriate measure of damages to award Plaintiff and the other Class members; and

h   The appropriate declaratory relief to which Plaintiff and the other Class members are entitled.

76.   **Typicality:** Plaintiff's claims are typical of the other Class members' claims because Plaintiff and each of the other Class members is entitled to video service provider

fee payments from Defendants pursuant to 220 ILCS 5/21-801 and Defendants have failed to pay Plaintiff and each of the other Class members those video service provider fees. Plaintiff is asserting the same claims and legal theories individually.

77.    **Adequacy of Representation:** Plaintiff is an adequate Class representative because its interests do not conflict with the interests of the other Class members who they seek to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where defendants breached statutory obligations, and Plaintiff intends to prosecute this action vigorously. Class members' interests will be fairly and adequately protected by Plaintiff and its counsel.

78.    **Declaratory and Injunctive Relief:** Defendants acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and/or declaratory relief, as described below, with respect to the Class members.

79.    **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device

presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.   CLAIMS ALLEGED

### COUNT I

### Action for Declaratory Relief
### (on behalf of Plaintiff individually and on behalf of the Class)

80.   Plaintiff repeats, realleges, and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

81.   Defendants provide "video services", and are "video service providers", in East St. Louis and each city, village, incorporated town, and county comprising the Class pursuant to 220 ILCS 5/21-201(v) and (h) of the Act.

82.   Defendants derive gross revenue, as defined in 220 ILCS 5/21-801(c), from providing video services in East St. Louis and each city, village, incorporated town, and county comprising the Class.

83.   Defendants have failed to comply with 220 ILCS 5/21-301 as they have failed to obtain a State-issued authorization for their video service.

84.   Defendants have failed to comply with ILCS 5/21-801 as they have failed to provide at least 10 days-notice to Plaintiff and other Illinois municipalities prior to providing video service in a jurisdiction.

85.     Defendants have failed to comply with 220 ILCS 5/21-801 as they have failed to pay Plaintiff and the other Class members the required video service provider fees.

86.     Pursuant to 220 ILCS 5/21-801, 220 ILCS 5/21-1301(a) and 65 ILCS 5/11-42-11.05, Plaintiff has the right to enforce applicable rights and obligations, including to audit and collection of any deficiency.

87.     Pursuant to 28 U.S.C. §§ 2201-2202, Plaintiffs seek a declaration, and resulting order, from the Court that:

a. Each Defendant provides "video services", and are "video service providers", in East St. Louis and each city, village, incorporated town, and county comprising the Class pursuant to 220 ILCS 5/21-201(v) and (h) of the Act;

b. Defendants derive gross revenue, as defined in 220 ILCS 5/21-801(c), from providing video services in East St. Louis and each city, village, incorporated town, and county comprising the Class;

c. Defendants have failed to comply with 220 ILCS 5/21-301 as they have failed to obtain a State-issued authorization for their video service;

d. Defendant have failed to comply with ILCS 5/21-801 as they have failed to provide at least 10 days-notice to Plaintiff and other Illinois municipalities prior to providing video service in a jurisdiction; and

e.  Defendants have failed to comply with 220 ILCS 5/21-801 as they have failed to pay Plaintiff and the other Class members the required video service provider fees.

88.  Plaintiff and the other Class members are, therefore, entitled to damages as a result of Defendants' violations of 220 ILCS 5/21-201 and 220 ILCS 5/21-801, along with pre-and post-judgment interest, in an amount to be determined at trial.

## COUNT II

### Violation of Cable and Video Competition Law of 2007, 220 ILCS 5/21-801 et seq., (on behalf of Plaintiff individually and on behalf of the Class)

89.  Plaintiff repeats, realleges, and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

90.  Defendants provide video service, and are video service providers, in East St. Louis and every city, village and county comprising the Class. 220 ILCS 5/21-201.

91.  Defendants derive gross revenues from providing these video services.

92.  Defendants are thus required, by statute, to pay Plaintiff and each Class member in which they provide video service, a video service provider fee of up to 5% of their gross revenues derived from their operations in that municipality. 220 ILCS 5/21-801.

93.  Failure to receive the required authorization from the Illinois Commerce Commission does not relieve Defendants' obligation to comply.

94.     Defendants have failed to comply with 220 ILCS 5/21-801 because they have failed to pay Plaintiff and the other Class members up to 5% of gross revenues, as required.

95.     Defendants have failed to provide Plaintiff and other Class members with the mandatory 10-days' notice required by 220 ILCS 5/21-801 prior to Defendants providing video service in the jurisdiction of Plaintiff and other Class members.

96.     To the extent that Plaintiff and other Class members have not adopted an ordinance imposing a 5% video service fee as to one or more Defendants, there is no such ordinance requirement when Defendants have failed to provide proper notice to Plaintiff and other Class members under 220 ILCS 5/21-801 such that Plaintiff and other Class members could properly adopt such an ordinance.

97.     Plaintiff and the other Class members are, therefore, entitled to damages as a result of Defendants' violations of 220 ILCS 5/21-801, along with pre- and post-judgment interest, in an amount to be determined at trial.

## COUNT III

### Trespass
### (on behalf of Plaintiff individually and on behalf of the Class)

98.     Plaintiff repeats, realleges, and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

99.     Defendants provide video programming services to subscribers through wireline facilities located at least in part in public rights-of-way.

29

100.     Plaintiff and Class members control the use of their public rights-of-way.

101.     The use of public rights-of-way provided by Plaintiff and Class members is not gratuitous.

102.     Upon information and belief, without legal authority, Defendants have unlawfully entered upon the property of Plaintiff and Class members by causing their video content to stream onto servers either inside of or directly connected to an internet service provider, and from there, the internet service provider directly delivers the content through the public rights of way to a customer.

103.     As such, Defendants have caused a physical invasion of the rights of ways located within the respective jurisdictions of Plaintiff and Class members.

## COUNT IV

### Unjust Enrichment
### (on behalf of Plaintiff individually and on behalf of the Class)

104.     Plaintiff repeats, realleges, and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

105.     Plaintiff and Class members have conferred a benefit upon Defendants through providing the public rights of way used by Defendants to deliver video programming services to subscribers.

106.     Defendants have engaged in wrongful conduct in retaining the benefit conferred upon them by Plaintiff and Class members in the form of the public rights of way by, among other potential acts or omissions, failing to apply for proper authorization

for use of the rights of way and failing to notify Plaintiff and Class members of their use of the rights of way.

107.    Plaintiff and Class members have not been compensated by Defendants for the use of their public rights of way.

108.    Defendants' retention of the benefit conferred upon them by Plaintiff and Class members, without compensating Plaintiff and Class members for the same, violates the fundamental principles of justice, equity, and good conscience.

109.    Defendants have been unjustly enriched by their use of the rights of ways owned and maintained by Plaintiff and Class members as alleged herein.

110.    The profits Defendants have enjoyed should be disgorged in favor of Plaintiff and Class members as a proper remedy for this tortious conduct.

111.    Plaintiff and the other Class members are, therefore, entitled to damages as a result of Defendants' violations of 220 ILCS 5/21-801, along with pre- and post-judgment interest, in an amount to be determined at trial.

## COUNT V

### Violation of City of East St. Louis Ordinance § 82-19
### (individually on behalf of Plaintiff)

112.    Plaintiff repeats, realleges, and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

113.   Upon information and belief, in order to provide faster video service to more consumers within the City of East St. Louis, Defendants have entered into a number of paid private agreements with broadband providers in the City of East St. Louis.

114.   For example, on February 23, 2014, Netflix entered into an agreement with Comcast, the country's largest cable and broadband provider, in which Netflix will pay Comcast for faster and more reliable access to Comcast's subscribers.[26] Comcast will now bypass third-party distributors and connect directly to Netflix's own servers in its data centers.  While details were not disclosed, a source close to the companies said it involved annual payments of several million dollars.

115.   Upon information and belief, in addition to Netflix, some or all of the Defendants have purchased access through these peering agreements with broadband providers in the City of East St. Louis, without providing the City of East St. Louis notice, or applying for authorization, thus skirting their obligation to pay a video service provider fee of 5% of their gross revenues derived from providing such video service in the City of East St. Louis.

116.   The Defendants have resold their video streaming service to subscribers within the City of East St. Louis in violation of local ordinance.

---

[26] Wyatt, Edward and Cohen, Noam *"Comcast and Netflix Reach Deal on Service"* New York Times, February 23, 2014

117.    It is unlawful for any party or person to resell cable communication signals or service within the city without, prior to such sale, having obtained written consent and approval of both the operating franchise company and the city. East St. Louis Municipal Code § 82-19, **(Exhibit A.)**

118.    East St. Louis Municipal Code § 82-19, entitled "Unlawful resale of cable service" states that "no person shall resell cable communication signals or service within the city without, prior to such sale, having obtained written consent and approval of both the operating franchise company and the city." (Ord. No. 83-10033, § II, 9-21-1983)

119.    Cable television service is defined within the East St. Louis Municipal Code as "any and all services provided by or through the facilities of any cable television or closed-circuit coaxial cable communication system, or any microwave or similar transmission service used in connection with any cable television system or similar closed circuit coaxial cable communication system." East St. Louis Municipal Code § 82-20.

120.    Defendants provide services by and through the facilities of coaxial cable communication systems, as defined by East St. Louis Municipal Code § 82-20.

121.    Defendants' services include video programming services.

122.    By transmitting video programming service to subscribers via a coaxial cable or fiber optics, Defendants are providing a service used in connection with a cable television system.  "Cable television" is defined by the Telecommunications Act

of 1996, 47 U.S.C. § 521, as "a video delivery service provided by a cable operator to subscribers via a coaxial cable or fiber optics." A cable operator is "any person or group of persons who provides cable service over a cable system." Cable service is "the transmission to subscriber of video programming, or other programming service."

123.    The Defendants' actions and omissions, including their entering into agreements with broadband providers who pay the video service provider fee, in order provide video service in Illinois municipalities without paying the video service fee, constitute the unlawful resale of cable communication signals or service, as defined by, and in violation of, § 82-19.

124.    Defendants then have resold their cable communication signals or service to subscribers without having obtained written consent and approval of Plaintiff.

125.    Each resale in violation of § 82-19 of the East St. Louis Municipal Code is subject to a penalty pursuant to East St. Louis Municipal Code Section § 1-15 **(Exhibit B)**, which provides:

**Sec. 1-15. - General penalty.**

(a)

Whenever in this Code or in any ordinance of the city any act is prohibited or declared to be unlawful or an offense, or whenever in such Code or ordinance the doing of any act is required or the failure to do any act is declared to be

unlawful, where no specific penalty is provided therefor, the violation of any such provision of this Code or any ordinance shall be a misdemeanor, to the extent permitted by 65 ILCS 5/1-2-1.1, and, in any case, shall be punished by a fine not exceeding $750.00 and/or imprisonment not exceeding six months. Each day any violation of any provision of this Code or of any ordinance shall constitute a separate offense.

(Code 1975, § 1-6)

126.    The Defendants' unlawful acts and omissions of the resale of cable communication signals or service, has violated, is currently violating, and will continue into the indeterminable future to violate the Municipal Code as aforementioned and, thus, Defendants are subject to daily fines for each past, present, and future ordinance violation.

127.    Plaintiff is entitled to fines consistent with the City of East St. Louis Municipal Code for each and every separate offense, along with pre- and post-judgment interest, in an amount to be determined at trial.

**VII.    REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

a.    Enter an Order certifying the above-defined Class and designating Plaintiff as Class Representative, and Plaintiff's counsel as Class Counsel;

b.      Award all monetary relief to which Plaintiff and the other Class members are entitled, including as set forth above;

c.      Enter an order granting declaratory relief that Defendants have violated 220 ILCS 5/21-201 and 220 ILCS 5/21-801 by failing to obtain a State-issued authorization for their video service, failing to provide at least 10 days-notice prior to providing video service in a jurisdiction, and/or failing to pay the required video service provider fees;

d.      Award Plaintiff and the other Class members damages to include 5% of all gross revenues derived from operations in the respective municipality;

e.      Enter a finding that the Defendants have trespassed upon the property of the City of East St. Louis and other Class members;

f.      Enter a finding that the Defendants have been unjustly enriched as a direct result of their trespass upon the property of the City of East St. Louis and other Class members;

g.      Enter a judgment as an adequate remedy at law in favor of the City of East St. Louis and other Class members as damages for Defendants' trespass and unjust enrichment;

h.      Enter an order finding the Defendants have resold cable communication signals or service within the city without, prior to such sale, having obtained written consent and approval of Plaintiff, for each and every sale

36

to its subscribers or members in violation of East St. Louis Municipal Code

§ 82-19;

i.      Enter an order assessing a civil monetary penalty for each resale of cable

communication signals or service within the city without the written

consent and approval of both the operating franchise company and the city,

pursuant to East St, Louis Municipal Code Section § 1-15, not to exceed the

sum of $750.00 for each resale thereof;

j.      Award pre- and post-judgment interest;

k.      Award reasonable attorneys' fees and costs to Plaintiff's counsel; and

l.      Grant such further and other relief as this Court deems appropriate.

Plaintiff demands a jury trial on some or all issues triable of right by a jury.

Dated  December 30, 2021

                      **CITY OF EAST ST. LOUIS,** individually and on behalf of all others similarly situated**, PLAINTIFF,**

                          */s/ John J. Driscoll*
                          John J. Driscoll
                          THE DRISCOLL FIRM, LLC
                          1311 Ave. Ponce de Leon
                          6th Floor
                          San Juan, PR 00907
                          (314) 932-3232
                          (314) 932-3233 (facsimile)
                          john@jjlegal.com

/s/ John Baricevic
John Baricevic
C.J. Baricevic
CORPORATE COUNSEL
CHATHAM & BARICEVIC
107 W. Main, Suite 1
Belleville, IL 62220
(618) 233-2200
cj@chathamlaw.com

/s/ Roy L. Mason
Roy L. Mason
Zach E. Howerton
SMOUSE & MASON, LLC
223 Duke of Gloucester Street
Annapolis, MD 21401
(410) 269-6620
rlm@smouseandmason.com
zeh@smouseandmason.com

/s/ Marc D. Grossman
Marc D. Grossman (*pro hac vice pending*)
Melissa K. Sims
Greg Coleman (*pro hac vice pending*)
Daniel K. Bryson (*pro hac vice pending*)
Patrick M. Wallace (*pro hac vice pending*)
James DeMay *(pro hac vice pending)*
Victoria J. Maniatis (*pro hac vice pending*)
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
(800) 530-9800
mgrossman@milberg.com
msims@milberg.com
gcoleman@milberg.com
dbryson@milberg.com
pwallace@milberg.com
jdemay@milberg.com
vmaniatis@milberg.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**CITY OF EAST ST. LOUIS,** individually and
on behalf of all others similarly situated,

        Plaintiff,

    v.

**NETFLIX, INC., DISNEY PLATFORM
DISTRIBUTION, INC., APPLE INC., HULU,
LLC, WARNERMEDIA DIRECT, LLC,
AMAZON.COM SERVICES, LLC, CBS
INTERACTIVE INC., YOUTUBE LLC,
CURIOSITYSTREAM, INC., PEACOCK TV,
LLC, DIRECTV, LLC,** and **DISH NETWORK,
LLC**

        Defendants.

Case No.: 2021-CV-00561

MAB

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on December 30, 2021, the foregoing document

was electronically filed with the Clerk of Court and will be served by operation of the

Court's CM/ECF system upon all registered parties.

                                 */s/ John J. Driscoll*
                                 John J. Driscoll
                                 THE DRISCOLL FIRM, LLC
                                 1311 Ave. Ponce de Leon  6th Floor
                                 San Juan, PR 00907
                                 (314) 932-3232
                                 (314) 932-3233 (facsimile)
                                 john@jjlegal.com

1

/s/John Baricevic
John Baricevic
C.J. Baricevic
CORPORATE COUNSEL
CHATHAM & BARICEVIC
107 W. Main, Suite 1
Belleville, IL 62220
(618) 233-2200
john@chathamlaw.com

/s/ Roy L. Mason
Roy L. Mason
Zach E. Howerton
SMOUSE & MASON, LLC
223 Duke of Gloucester Street
Annapolis, MD 21401
(410) 269-6620
rlm@smouseandmason.com
zeh@smouseandmason.com

/s/ Marc D. Grossman
Marc D. Grossman (*pro hac vice pending*)
Melissa K. Sims
Greg Coleman (*pro hac vice pending*)
Daniel K. Bryson (*pro hac vice pending*)
Patrick M. Wallace (*pro hac vice pending*)
James DeMay *(pro hac vice pending)*
Victoria J. Maniatis *(pro hac vice pending)*
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
(800) 530-9800
mgrossman@milberg.com
msims@milberg.com
gcoleman@milberg.com
dbryson@milberg.com
pwallace@milberg.com
jdemay@milberg.com
vmaniatis@milberg.com

2

Case 3:21-cv-00561-MAB   Document 167   Filed 12/30/21   Page 41 of 42   Page ID #625
East St. Louis Municipal Code
Case: 22-2905     Document: 49     Filed: 02/14/2023     Pages: 109

No person shall resell cable communication signals or service within the city without, prior to such sale, having obtained written consent and approval of both the operating franchise company and the city.

(Ord. No. 83-10033, § 11, 9-21-1983)



**EXHIBIT A**

Case 3:21-cv-00561-MAB   Document 167   Filed 12/30/21   Page 42 of 42   Page ID #626
Case: 22-2905     Document: 49     Filed: 02/14/2023     Pages: 109

(a) Whenever in this Code or in any ordinance of the city any act is prohibited or declared to be unlawful or an offense, or whenever in such Code or ordinance the doing of any act is required or the failure to do any act is declared to be unlawful, where no specific penalty is provided therefor, the violation of any such provision of this Code or any ordinance shall be a misdemeanor, to the extent permitted by 65 ILCS 5/1-2-1.1, and, in any case, shall be punished by a fine not exceeding $750.00 and/or imprisonment not exceeding six months. Each day any violation of any provision of this Code or of any ordinance shall constitute a separate offense.

(b) A penalty imposed for a violation of an ordinance or code section may include, or consist of, a requirement that the defendant perform some reasonable public service work, such as, but not limited to, the picking up of litter in public parks or along public highways or the maintenance of public facilities. The provisions of this section which allow imposition of imprisonment in addition to a fine or the imposition of public service work shall not apply to the violation of ordinances or code sections enacted pursuant to 65 ILCS 5/11-5-1, 5/11-5-4, 5/11-5-5, 5/11-5-6, 5/11-40-1, 5/11-40-2, 5/11-40-2a, 5/11-80-9 or 5/11-8-16, as amended, nor to sections adopted which replace or add to such sections, nor to ordinances adopted pursuant to authority granted by 625 ILCS 5/11-208.

(Code 1975, § 1-6)

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CITY OF EAST ST. LOUIS,<br>Individually and on behalf of all others<br>similarly situated, | )<br>)<br>)<br>) | |
| Plaintiff, | ) | Case No. 3:21-CV-561-MAB[1] |
| | ) | |
| vs. | )<br>) | |
| NETFLIX, INC.,<br>DISNEY PLATFORM DISTRIBUTION,<br>INC., APPLE, INC., HULU, INC.,<br>WARNERMEDIA DIRECT, LLC,<br>AMAZON.COM SERVICES, LLC,<br>CBS INTERACTIVE, INC.,<br>YOUTUBE, LLC,<br>CURIOSITYSTREAM, INC.,<br>PEACOCK TV, LLC,<br>DIRECTV, LLC, and<br>DISH NETWORK, LLC, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the Motions to Dismiss filed by each of the Defendants (Docs. 172, 173, 174, 176, 178). Plaintiff filed an omnibus response in opposition to the motions to dismiss (Doc. 184), and each Defendant filed a reply brief (Docs. 187, 188, 189, 190, 191). Defendants also requested leave to file supplemental authority in support of their motions to dismiss (Docs. 197, 200), which the Court granted

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (*see* Doc.150).

over Plaintiff's opposition (Doc. 205; *see also* Doc. 199, 204).

Although Defendants requested oral argument on the motions to dismiss, the Court has reviewed the papers submitted and determined that oral argument is not necessary. For the reasons that follow, Defendants' motions to dismiss are granted.

<u>BACKGROUND</u>

In Illinois, all persons or entities "seeking to provide cable service or video service" are required to obtain authorization from the government to provide their services. *E.g.*, 220 ILL. COMP. STAT. 5/21-301(a). Such authorization is commonly referred to as a "franchise." In the past, providers had to obtain authorization from each individual municipality. *See* Illinois Senate Bill 678, Bill for an Act Concerning Telecommunications, 95th General Assembly, House Proceedings, May 31, 2007, at 234 (statement of Rep. Brosnahan).[2]  But since 2007, when Illinois enacted the Cable and Video Competition Law (220 ILL. COMP. STAT. 5/21-100, *et. seq*) (the "CVCL"), providers can now obtain a single state-wide authorization from the Illinois Commerce Commission. 220 ILL. COMP. STAT. 5/21-301(a).[3]

The CVCL defines "video service" to include "video programming . . . that is provided through wireline facilities located at least in part in the public rights-of-way

---

[2] Available on Westlaw at IL H.R. Tran. 2007 Reg. Sess. No. 65.

[3] Providers also still have the option of obtaining a cable television franchise from each individual municipality and/or county. *E.g.*, 220 ILL. COMP. STAT. 5/21-301(a) (citing Illinois Municipal Code, 65 ILL. COMP. STAT. 5/11-42-11, and Counties Code, 55 ILL. COMP. STAT. 5/5-1095). *See also* 220 ILL. COMP. STAT. 5/21-401(a)(2) ("Nothing in this Section shall prohibit a local unit of government from granting a permit to a person or entity for the use of the public rights-of-way to install or construct facilities to provide cable service or video service, at its sole discretion.").

without regard to delivery technology, including internet protocol technology. 220 Ill. Comp. Stat. 5/21-201(v). But it expressly excludes from the "video service" definition "video programming provided by a commercial mobile service provider . . . or any video programming provided solely as part of, and via, service that enables users to access content, information, electronic mail, or other services offered over the public internet." *Id.* If an entity's services fall within the definition, it must obtain a State-issued authorization from the Illinois Commerce Commission before it can "use the public rights-of-way for the installation or construction of facilities for the provision of cable service or video service or offer cable service or video service . . . ." *Id.* at 401(a), (b).

The CVCL imposes numerous requirements on "holders," that is entities who are granted state-wide authorizations to offer or provide cable or video service. *See* 220 Ill. Comp. Stat. 5/21-601, 701, 801, 901, 1001, 1101. *See also id.* at 201(k) (defining "holder). Most notably, holders are required to pay a service provider fee to all local units of government within whose boundaries the holders offer cable or video service. *Id.* at 801(b).[4] To that end, before offering cable service or video service within the jurisdiction of a local unit of government, a holder is required to notify the local unit of government. *Id.* at 801(a). The local unit of government is then required to adopt an ordinance imposing the service provider fee. *Id.* at 801(b).

The instant case involves the CVCL's application to the twelve Defendants, who are all "over the top" video service providers that charge subscribers a fee to access and

---

[4] A "local unit of government" is defined by the CVCL as "a city, village, incorporated town, or county." 220 Ill. Comp. Stat. 5/21-201(o).

stream their programming over the Internet (Doc. 167, ¶¶5–17, 30, 33; Doc. 184, p. 16 n.1). To watch Defendants' video content, subscribers use their own internet-connected device (such as smart televisions, streaming media players like Roku or Apple TV, tablets, smartphones, personal computers, etc.) (Doc. 167, ¶37). And subscribers connect to the internet through the internet service provider ("ISP") of their choice (*Id.* at ¶52). Defendants' subscribers typically use a broadband internet connection, such as DSL or fiber optic cable, to view Defendants' video content (*Id.* at ¶48). A broadband connection relies on the ISPs' wireline facilities located in whole or in part in the public right(s)-of-way (*Id.* at ¶¶36, 50). In other words, Defendants' video content is delivered from their servers to subscribers' devices through third-party ISPs' wireline facilities located in the public rights-of-way. Defendants do not provide internet access, nor do they own, control, or operate wireline facilities in any Illinois public right-of-way (*Id.* at ¶¶52, 60).

The City of East St. Louis, Illinois ("Plaintiff") brought this putative class action against Defendants on behalf of all Illinois cities, villages, incorporated towns, and counties in which one or more of the Defendants provide video service (Doc. 1, Doc. 167). Plaintiff alleges that Defendants have all engaged in ongoing violations of the Illinois CVCL by providing video service using the public rights-of-way without first obtaining authorization from the Illinois Commerce Commission and without paying the requisite fees to municipalities (Counts 1 and 2). Plaintiff also asserts claims for trespass (Count 3),

unjust enrichment (Count 4), and violation of East St. Louis Municipal Ordinance §82-19

(Count 5) (Doc. 167).[5]

### LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) addresses the legal sufficiency of the

plaintiff's claim for relief, not the merits of the case or whether the plaintiff will ultimately

prevail. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014); *Gibson v.*

*City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a motion to dismiss, a

complaint must contain sufficient factual matter to plausibly suggest that the plaintiff has

a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)). A complaint need not allege specific facts, but it may

not rest entirely on conclusory statements or empty recitations of the elements of the

cause of action. *Iqbal*, 556 U.S. at 678. *See also Dix v. Edelman Fin. Servs., LLC*, 978 F.3d 507,

512–13 (7th Cir. 2020) ("[L]egal conclusions and conclusory allegations . . . are not entitled

---

[5] This Court also presided over a substantially similar putative class action filed by the Village of Shiloh, Illinois. *See Village of Shiloh v. Netflix, Inc., et. al.*, SDIL Case No. 21-cv-807-MAB. That case was removed here from the Circuit Court of St. Clair County, Illinois; it was originally filed five days after East St. Louis filed the instant case. The Village of Shiloh timely moved to remand its case, claiming that under comity principles, the case should be decided by an Illinois state court. *See id.* at Docs. 45, 46; *City of Fishers, Indiana v. DIRECTV*, 5 F.4th 750, 752–53 (7th Cir. 2021). In other words, the Village of Shiloh contended a state court, not a federal court, needed to answer the same questions that East St. Louis chose to submit to a federal forum. Ultimately, the Court chose to rule on the comity issue in *Village of Shiloh* rather than consider options for managing duplicative cases (*e.g.*, consolidation, stay, or dismissal) because comity abstention was the *only* issue formally before the Court—neither side had filed a motion regarding the management of the two cases nor provided any authority indicating that case management decisions should trump comity abstention principles—and the case was remanded. SDIL Case No 21-cv-807-MAB, Doc. 68, pp. 12–15. The Court recognized, however, the remand created an unusual and non-ideal situation in which duplicative lawsuits were proceeding in state and federal court and thus suggested any party could ask for a stay in either case. *Id.* No party asked the Court to stay the instant case, but they did ask for and were granted a stay in state court in *Village of Shiloh*, thus volleying the issues back to federal court. *See* SDIL Case No. 21-cv-807-MAB, Doc. 77. Accordingly, the undersigned is now tasked with determining whether Plaintiff has stated a claim for relief under Illinois law.

to this presumption of truth.") (citation omitted). In deciding whether the complaint sufficiently states a claim, courts take well-pleaded allegations in the complaint as true and draw all permissible inferences in favor of the plaintiff. *E.g., Dix*, 978 F.3d at 512–13. Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

## DISCUSSION

### A. COUNTS 1 & 2 FOR VIOLATIONS OF THE ILLINOIS CVCL

Plaintiff alleges that Defendants violated the CVCL by failing to obtain a State-issued authorization for their video service, failing to provide notice to municipalities prior to providing video service, and failing to pay municipalities the required video service provider fees (Doc. 167, ¶¶80–97).

Defendants offer a myriad of independent reasons as to why Counts 1 and 2 should be dismissed. For example, Defendants argue the CVCL does not apply to them because they are not facilities-based providers and do not have any physical infrastructure (e.g., poles, wires and cables buried underground, utility boxes, etc.) in the public rights-of-way. They argue they are excluded from the CVCL under the public internet exemption. They argue the CVCL is preempted by various statutes, conflicts with Orders from the Federal Communications Commission, and that its application would violate the Internet Tax Freedom Act, the United States Constitution, the Illinois Constitution. The Court, however, need not reach any of those arguments because it finds another threshold argument is dispositive: the CVCL does not provide Plaintiff with a

right of action (Doc. 173, pp. 4–12; Doc. 179, pp. 39–43).

Under Illinois law, a party can file suit for violation of a statute only if the statute provides a right of action. *See Medicos Pain & Surgical Specialists, S.C. v. Travelers Indem. Co. of Am.*, 103 N.E.3d 965, 972 (Ill. App. Ct. 2018); *Midwest Med. Recs. Ass'n, Inc. v. Brown*, 97 N.E.3d 125, 136 (Ill. App. Ct. 2018) (citing *Gassman v. Clerk of the Cir. Ct. of Cook Cnty.*, 71 N.E.3d 783, 790 (Ill. App. Ct. 2017). "A statute may provide for an express right of action to redress a violation of its provisions." *1541 N. Bosworth Condo. Ass'n v. Hanna Architects, Inc.*, ---N.E.3d---, 2021 WL 6135459, *5 (Ill. App. Ct. 2021), *appeal denied*, 187 N.E.3d 704 (Ill. 2022). When a statute does not expressly provide for a private right of action, a court can consider whether an implied right of action exists. *Id.*

Determining whether the CVCL provides a right of action is an issue of first impression, which means the Court must interpret the statute as it thinks the Illinois Supreme Court would interpret it. *Frye v. Auto-Owners Ins. Co.*, 845 F.3d 782, 786 (7th Cir. 2017); *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012). As a federal court interpreting Illinois law, the Court must apply Illinois' rules of statutory construction. *In re Hernandez*, 918 F.3d 563, 569 (7th Cir. 2019) (citation omitted). "The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature[.]" *In re Hernandez*, 918 F.3d at 569 (citing *People v. Donoho*, 788 N.E.2d 707, 715 (Ill. 2003)). "The best evidence of legislative intent is the statutory language," which must be given its plain and ordinary meaning. *Donoho*, 788 N.E.2d at 715; *Haage v. Zavala*, 183 N.E.3d 830, 842 (Ill. 2021). When construing statutory language, the statute must be viewed in its entirety; words and phrases must be interpreted in light of other relevant

provisions of the statute and must not be construed in isolation. *Eighner v. Tiernan*, 184 N.E.3d 194, 199 (Ill. 2021); *Hubble v. Bi-State Dev. Agency of Illinois-Missouri Metro. Dist.*, 938 N.E.2d 483, 489 (Ill. 2010). In addition to the language of the statute, the court, in determining legislative intent, may also consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another. *Hubble*, 938 N.E.2d at 489. In construing a statute, courts presume that the General Assembly did not intend absurdity, inconvenience, or injustice. *Michigan Ave. Nat'l Bank v. Cnty. of Cook,* 732 N.E.2d 528, 535 (Ill. 2000).

### 1. Express Right of Action

Defendants argue the CVCL does not provide an express cause of action (*e.g.*, Doc. 173, pp. 4–12; Doc. 179, pp. 39–41), while Plaintiff contends that it does (Doc. 184, pp. 39–40). The dispute centers on the language of §1301 of the CVCL (*see* Doc. 167, ¶29; Doc. 184, p. 39). This section is titled "Enforcement; penalties," and it initially provides that, "The Attorney General is responsible for administering and ensuring holders' compliance with [the CVCL], provided that nothing in [the CVCL] shall deprive local units of government of the right to enforce applicable rights and obligations." 220 ILL. COMP. STAT. 5/21-1301(a). Section 1301 then goes on to delineate the authority the Attorney General has and the actions the Attorney General can take in enforcing the CVCL, including "conduct[ing] an investigation regarding possible violations by holders" of the CVCL; "bring[ing] an action in a court of competent jurisdiction in the name of the People of the State" if a violation of the CVCL is identified; and seeking monetary penalties in an action against a holder. 220 ILL. COMP. STAT. 5/21-1301(b), (c), (d), and (e).

Section 1301 clearly provides an express right of action to the Attorney General by explicitly stating that the Attorney General may institute a lawsuit against holders for violations of the CVCL. 220 ILL. COMP. STAT. 5/21-1301(c). Notably, §1301 does not state that local units of government may do the same. *See id.* In fact, §1301 does not affirmatively delegate any sort of power or authority to local units of government when it comes to enforcing the CVCL. *See id.* It merely says that the CVCL does not "deprive local units of government of the right to enforce applicable rights and obligations." *Id.* at 1301(a). This is the language that Plaintiff gloms on to. Plaintiff says this language means that it can bring a lawsuit to enforce "the rights and obligations [that] are spelled out in the CVCL" (Doc. 184, p. 40; *see also id.* at p. 17). But Plaintiff's argument is refuted by reading section §1301 in its entirety and in the context of the CVCL as a whole.

To begin with, when the General Assembly intends to create a right of action, it certainly knows how to do so. This concept is illustrated by another section of the CVCL, specifically §401, which provides in part that, "[a] local unit of government or the Attorney General may seek to bar a transfer of ownership by filing suit in a court of competent jurisdiction . . . ." 220 ILL. COMP. STAT. 5/21-401(f). In other words, §401 provides local units of government with a limited right of action to challenge certain transfers of state-wide authorizations. Similarly, a portion of the Cable and Video Customer Protection Law—which was enacted at the same time as the CVCL and works in tandem with the CVCL[6]—provides that "[t]he Attorney General and the local unit of

---

[6] In June 2007, the General Assembly enacted Public Act 95-9, which, amongst other things, amended the Public Utilities Act by adding the Cable and Video Competition Law ("the CVCL") (codified at 220 ILL.

government may enforce all of the customer service and privacy protection standards of this Section with respect to complaints received from residents within the local unit of government's jurisdiction . . . ." 220 Ill. Comp. Stat. 5/22-501(r). These two statutes demonstrate that when the legislature intended to create a right of action for local units of government, it knew how to do so unequivocally and unmistakably. *See Conaghan v. City of Harvard*, 60 N.E.3d 987, 1002 (Ill. App. Ct. 2016) ("When the legislature intended to create a new cause of action, it knew how to do so without leaving any doubt as to its purpose.").

In contrast, §1301 does not contain any language expressly authorizing a local government to bring suits like the instant action for purported violations of the CVCL. Rather, §1301 makes clear that enforcement is to be left to the Attorney General. "The familiar maxim *expressio unius est exclusio alterius* is an aid of statutory interpretation meaning 'the expression of one thing is the exclusion of another.'" *Metzger v. DaRosa*, 805 N.E.2d 1165, 1172 (Ill. 2004) (citing Black's Law Dictionary 581 (6th ed. 1990)). "It expresses the learning of common experience that when people say one thing they do not mean something else." *Metzger*, 805 N.E2d at 1172. The fact that §1301 gives the Attorney General an express right of action does not imply that local governments can also bring suit under that section. Similarly, just because local governments are authorized to bring suit under §401 of the CVCL does not imply they can bring suit to enforce other sections

---

Comp. Stat. 5/21-100, *et seq.*(2007)), and the Cable and Video Customer Protection Law (codified at 220 Ill. Comp. Stat. 13-507.1, *et seq.* (2007) (current version at 220 Ill. Comp. Stat. 5/22-501, *et seq.*))). S.B. 678, 95th Gen. Assemb., Reg. Sess. (Ill. 2007); Ill. P.A. 95-9, art. 15, §§ 15-5, 15-25 (2007).

of the CVCL. *See Metzger*, 805 N.E2d at 1172 ("Where, as here, the legislature has expressly provided a private right of action in a specific section of the statute, we believe the legislature did not intend to imply private rights of action to enforce other sections of the same statute."). If the legislature intended as much, it would have explicitly said so in clear and unambiguous terms. *Rosenbach v. Six Flags Ent. Corp.*, 129 N.E.3d 1197, 1204 (Ill. 2019) ("When the statutory language is plain and unambiguous, we may not depart from the law's terms by reading into it exceptions, limitations, or conditions the legislature did not express, nor may we add provisions not found in the law.").

As Defendants point out, the language of §1301 regarding the right of local governments "to enforce applicable rights and obligations" is best understood as preserving the existing rights a local government may have (such as contract rights under a preexisting authorization) and the rights expressly provided for in the CVCL (such as the right to bring suit to contest certain transfers of ownership under §401(f)) (Doc. 173, p. 6; Doc. 179, p. 40). Simply put, there is no language in §1301 (or anywhere else in the CVCL) that expressly authorizes a local government to bring suits like the instant action for purported violations of the CVCL.

It also bears mentioning that §1301 only-authorizes suits against "holders," *see* 220 ILL. COMP. STAT. 5/21-1301, meaning persons or entities that have "received authorization to offer or provide cable or video service from the Commission pursuant to Section 21-401 of [the CVCL]." *Id.* at § 201(k). As the complaint makes clear, Defendants in this action are *not* holders (*e.g.*, Doc. 167, ¶83). No provision of the CVCL expressly authorizes anyone—not the Attorney General nor a local government—to bring suit against a "non-

holder" (Doc. 179, p. 28–30). The statute did not contemplate suits such as the instant case to compel video service providers who are–non-holders to apply for a state-wide authorization under the CVCL or to comply with the CVCL's requirements.

In sum, the CVCL does not provide an express right of action to Plaintiff to bring this lawsuit.

### 2. Home Rule Authority

Plaintiff also makes a perfunctory, undeveloped argument that it has the right to bring suit because, as a home rule municipality, it may "concurrently exercise those same powers as the State, provided that the State has not *specifically* declared the State's exercise to be exclusive," and in this instance, the CVCL does not explicitly declare that the State's ability to enforce compliance of the CVCL is exclusive (Doc. 184, p. 40). Plaintiff does not develop its argument any further or provide any supporting authority (*see id.*), which is enough in and of itself to reject Plaintiff's contention.[7]

Plaintiff's position also seems to involve a misapplication of the home rule concept. Home rule authority allows local governments "to legislate on a broad range of social and economic policies without prior state legislative approval." Paul A. Diller, *The*

---

[7] *E.g., Bank of Am., N.A. v. Veluchamy,* 643 F.3d 185, 190 (7th Cir. 2011) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.") (citation omitted); *United States v. Courtright,* 632 F.3d 363, 370 (7th Cir. 2011) ("[Courts] are not in the business of formulating arguments for the parties."); *Mahaffey v. Ramos,* 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."); *White Eagle Coop. Ass'n v. Conner,* 553 F.3d 467, 476 n. 6 (7th Cir.2009) ("[I]t is not the province of the courts to complete litigants' thoughts for them . . . ."); *Tyler v. Runyon,* 70 F.3d 458, 465 (7th Cir.1995) ("[I]f an appellant fails to make a minimally complete and comprehensible argument for each of his claims, he [or she] loses regardless of the merits of those claims as they might have appeared on a fuller presentation.").

*City and the Private Right of Action*, 64 STAN. L. REV. 1109, 1100 (2012). *See also City of*
*Chicago v. Roman*, 705 N.E.2d 81, 88 (Ill. 1998) ("The grant of home rule
powers contemplates that different communities which perceive a problem differently
may adopt different measures to address the problem, provided that the legislature has
taken no affirmative steps to circumscribe the measures that may be taken and that the
measures taken are reasonable.") (citation omitted). The Illinois Constitution authorizes
home rule units to "exercise any power and perform any function pertaining to its
government and affairs including, but not limited to, the power to regulate for the
protection of the public health, safety, morals and welfare; to license; to tax; and to incur
debt." Ill. Const. art. VII, § 6(a).[8] It further permits home rule units to "exercise and
perform concurrently with the State any power or function of a home-rule unit to the
extent that the General Assembly by law does not specifically limit the concurrent
exercise or specifically declare the State's exercise to be exclusive." *Id.* at § 6(i).

As these Constitutional provisions imply, a local government typically exercises
its home rule authority by *regulating*, meaning enacting ordinances related to its own local
affairs. Sarah Swan, *Home Rules*, 64 DUKE L.J. 823 (2015). In this instance, as Defendants
pointed out, there is no ordinance or other apparent exercise of home rule authority (Doc.
187, p. 3). Rather, the CVCL authorized the Attorney General to bring suit and Plaintiff is
claiming that home rule authority allows it to step into the Attorney General's shoes and

---

[8] *See also* Jim Webb, *Does This Home Rule the Courts? Carbondale's Tort Reform Ordinance*, 30 S. ILL. U. L.J. 123,
125 (2005).

file the lawsuit. In other words, a municipality can take over a specific duty statutorily delegated to a state-level official in instances where the state-level official has not yet acted or has declined to act. However, Plaintiff has not pointed the Court to any authority or illustrative examples demonstrating that home rule authority works in the manner it is claiming (*see* Doc. 184).

Plaintiff's reliance on home rule authority also appears to have other fatal flaws that were not brought up by Defendants. First, home rule authority relates only to local affairs and not those of the state,[9] but the CVCL explicitly states that "[t]he provision of competitive cable services and video services is a matter of statewide concern that extends beyond the boundaries of individual local units of government.") 220 Ill. Comp. Stat. 5/21-101(e). The CVCL also appears to limit the ability of local governments to act because it explicitly states that "[t]he provision of [the CVCL] are a limitation of home rule powers under subsection (i) of Section 6 of Article VII of the Illinois Constitution." 220 Ill. Comp. Stat. 5/21-1401.

For these reasons, Plaintiff has failed to establish that it has a right of action to bring this lawsuit based on home rule authority.

### 3.  Implied Right of Action

The lack of explicit statutory language granting local units of government the right

---

[9] *People ex rel. Bernardi v. City of Highland Park* 520 N.E.2d 316, 321 (Ill. 1988) ("The limited grant of power to home rule units in section 6(a) legitimizes only those assertions of authority that address problems faced by the regulating home rule unit, not those faced by the State or Federal governments."); *Wilson v. City of Chicago*, 900 F. Supp. 1015, 1024 (N.D. Ill. 1995), *aff'd*, 120 F.3d 681 (7th Cir. 1997) (citing *Ampersand Inc. v. Finley*,  338 N.E.2d 15, 18 (Ill. 1975)) ("Powers of a home rule unit relate only to its own affairs, not those of the state.").

to bring suit to enforce the CVCL is not necessarily dispositive because a court may determine that a private right of action is implied in a statute. *Fisher v. Lexington Health Care, Inc.*, 722 N.E.2d 1115, 1117 (Ill. 1999). Under Illinois law, courts will recognize an implied right of action only if all four of the following criteria are met: (1) the plaintiff is a member of the class for whose benefit the statute was enacted; (2) the plaintiff's injury is one the statute was designed to prevent; (3) a private right of action is consistent with the underlying purpose of the statute; and (4) implying a private right of action is necessary to provide an adequate remedy for statutory violations. *Horist v. Sudler & Co.*, 941 F.3d 274, 278 (7th Cir. 2019) (citing *Fisher*, 722 N.E.2d at 117).

Here, the Court opts to move directly to the third and fourth consideration, which it finds are not satisfied and thus dispositive of the issue. Implying a private right of action for local governments is not necessary to provide an adequate remedy for statutory violations. The Illinois Supreme Court has "implied a private right of action under a statute only in cases where the statute would be ineffective, as a practical matter, unless such an action were implied." *Fisher v. Lexington Health Care, Inc.*, 722 N.E.2d 1115, 1119–20 (Ill. 1999) (citing *Abbasi v. Paraskevoulakos,* 718 N.E.2d 181 (Ill. 1999)). *See also Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 546 N.E.2d 580, 600 (Ill. 1989) (Illinois courts will "imply a private remedy where there exists a *clear need* to effectuate the purpose of an act.") (emphasis in original) (citation omitted). But that is not the case here because the CVCL already provides a framework for enforcement—the Attorney General was granted the authority to investigate, penalize, and remedy violations of the CVCL. *See* 220 ILL. COMP. STAT. 5/21-1301. The penalties include significant monetary fines and suspension or

revocation of the holder's State-issued authorization. *Id.* at 1301(e).

Plaintiff, however, takes issue with local governments being left "entirely reliant upon a third-party, the State, to bring an action to enforce their rights" (Doc. 184, p. 42). Plaintiff argues that "if the State fails to bring such an action (as is the case here), there is no available remedy to local governments to address violations of the statute" (*Id.*). In other words, Plaintiff says the statutory remedies are inadequate because the Attorney General has not pursued those remedies in this instance. But Plaintiff's argument is misguided. First, it relies on an assumption that Defendants are, in fact, subject to the CVCL and have violated it. But Defendants vigorously contest that they are subject to the CVCL and the issue is by no means resolved in this Order. Second, the simple fact that the Attorney General has not pursued a lawsuit against video streaming platforms for purported violations of the CVCL does not somehow mean the statutory enforcement framework is an inadequate remedy. "[T]he applicable question . . . is whether the statute provides for a sufficient remedy, not whether a particular person or entity has, in fact, been sanctioned under the statute." *Carmichael v. Pro. Transportation, Inc.*, --- N.E.3d ---, 2021 WL 3925613, at *7) (Ill. App. Ct. 2021), *appeal denied*, 183 N.E.3d 890 (Ill. 2021). Plaintiff's argument implies that if the Attorney General had brought suit against video streaming platforms, then Plaintiff would have no quarrel with the statute's enforcement mechanism. But a local government's disagreement with the State's Attorney as to when it is appropriate to bring suit is not sufficient to show that the statutorily provided remedy is inadequate. *See id.*

Furthermore, implying a private right of action for local governments is not

consistent with the underlying purpose of the CVCL. The statute sought to implement a "state authorization process and uniform standards and procedures" for cable franchising. 220 ILL. COMP. STAT. 5/21-101; Illinois Senate Bill 678, Bill for an Act Concerning Telecommunications, 95th General Assembly, House Proceedings, May 31, 2007, at 233–45. It makes good sense that the legislature would centralize authority to enforce the *state-wide authorization* process administered by a *state agency* with the Attorney General, who is the *state's* chief legal officer, in order to ensure enforcement decisions served the interests of all Illinois consumers (rather than only the varying concerns of individual municipalities). It is does *not* make sense that the legislature would leave enforcement decisions to the whims of any and all of the more than a thousand municipalities in the State of Illinois, as Plaintiff contends.

The Court thus declines to imply a cause of action for Defendants' alleged violations of the CVCL. This decision aligns with courts who have examined similar statutes in other states and all concluded that those laws do not authorize local governments to sue, but rather limit claims to those brought by state enforcement authorities. *City of Reno, Nevada v. Netflix, Inc.*, 558 F. Supp. 3d 991, 997–1000 (D. Nev. 2021) (holding that the Nevada Legislature intended the State via the Office of the Attorney General to enforce actions, remedies, and penalties for violation of the Nevada Video Service Law, not local governments); *City of Ashdown, Arkansas v. Netflix, Inc.*, 565 F. Supp. 3d 1111, 1116–17 (W.D. Ark. 2021) (holding there was no language in the Arkansas Video Service Act that expressly authorized a municipality to bring suit and implying a right of action "would undermine the  clear intent of the statute," which was

for "the Arkansas Public Service Commission to ensure compliance."); *City of New Bos., Texas v. Netflix, Inc.*, 565 F. Supp. 3d 865, 869–70 (E.D. Tex. 2021) ("[T]he [Public Utility Commission], through the attorney general, is the body to determine who should be a holder of such a certificate and to enforce compliance if a party improperly fails to file for a certificate. . . . To allow a municipal plaintiff to bypass the [Public Utility Commission] would undermine the regulatory scheme set forth in the statute and its overall purpose to centralize the issuance of franchises in one statewide body."); *City of Lancaster v. Netflix*, No. 21STCV01881, 2021 WL 4470939, at *2–5 (Cal. Superior Ct., Sep. 20, 2021) (holding there was no express authority for a local government to sue a non-franchise holder for non-compliance with the Digital Infrastructure and Video Competition Act of 2006 and refusing to imply a right of action); *Gwinnett County, Georgia v. Netflix, Inc.*, No. 20-A-07909-10, 2022 WL 678784, at *3 (Ga. Superior Ct. Feb. 18, 2022) (holding no express or implied right of action existed for local governments to sue Defendants for alleged violations of Georgia's Consumer Choice for Television Act); *Borough of Longport v. Netflix, Inc.*, No. CV-21-15303-SRC-MAH, 2022 WL 1617740, at *2–3 (D.N.J. May 20, 2022) (same re: New Jersey's Cable Television Act); *City of Kenner v. Netflix, Inc. and Hulu, LLC*, Case No. 814-168 (24th Judicial Dist., Parish of Jefferson, LA Aug. 25, 2022), available at Doc. 201-1 (holding the Louisiana Consumer Choice for Television Act did not confer a right of action on local governments).[10]

---

[10] Additionally, the Ohio Attorney General recently filed an amicus brief in support of the streaming companies in the Ohio Supreme Court. *See* Brief for Ohio Attorney General as Amici Curiae in Support of Petitioners at 11-15, *City of Maple Heights v. Netflix, Inc.*, (Ohio, No. 2021-0864), 2021 WL 5205887. The Attorney General explained that Ohio's Video Service Authorization Law vested the Director of Commerce

In sum, the Court finds that Plaintiff does not have an express or implied right of action under the CVCL to bring this suit against Defendants. Accordingly, Counts 1 and 2 must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim. The dismissal is with prejudice because any amendment would be futile given that the CVCL does not provide Plaintiff with a cause of action. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 520 (7th Cir. 2015) (granting motion to dismiss with prejudice and without leave to amend is acceptable when "it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted . . . ." (quoting *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004))).

## B.   TRESPASS CLAIM (Count 3)

The complaint alleges that Defendants have committed a trespass by unlawfully entering upon the property of Plaintiff by causing their video content to be delivered to subscribers via wireline facilities located at least partially in public rights-of-way without compensating Plaintiff for their use of the public rights of way (Doc. 167, ¶¶98–103; *see also* Doc. 184, pp. 64–69).

The complaint concedes that Defendants have not and do not install, operate, or maintain any physical infrastructure in the public rights-of-way (*see* Doc. 167, ¶60; *see also* Doc. 184, p. 3 n.2). In other words, Defendants are not the ones putting wires and cables

---

with exclusive enforcement authority; that the creation of an express post-audit dispute right of action cuts against implying other rights of action; and that implying other rights of action for local governments would be inconsistent with the legislature's purpose of creating a uniform regulatory framework. *Id.* at 11–13.

under streets or on poles (*see* Doc. 167, ¶60). Rather, the complaint makes clear that it is the Internet Service Providers ("ISPs") who construct, install, and/or operate the physical infrastructure (*i.e.*, wireline facilities) in the public rights-of-way that provide internet access to customers (Doc. 167, ¶¶35, 39, 47, 52, 60). Defendants' video content is then transmitted across the ISPs' wireline facilities to subscribers (*Id.* at ¶¶35, 39, 47, 58, 102). There are no allegations that the ISPs unlawfully placed their wireline facilities in the public rights-of-way (*see* Doc. 167), and it can be reasonably inferred that the ISPs obtained the requisite authorization and pay the necessary fees to put their wireline facilities in place (*see* Doc. 167, ¶63) (admitting ISPs "do pay service provider fees"). To be clear, Plaintiff is not alleging that the ISPs' wirelines are a trespass; rather Plaintiff is alleging that the transmission of Defendants' video content through the ISPs' wirelines constitutes a trespass.

Under Illinois law, a trespass is committed by entering, or causing a thing or third person to enter, land possessed by someone else without permission, invitation, or other right. *Dial v. City of O'Fallon*, 411 N.E.2d 217, 220 (Ill. 1980); *Schweihs v. Chase Home Fin. LLC*, 187 N.E.3d 1196, 1207 (Ill. App. Ct. 2021) (citing *Benno v. Cent. Lake Cnty. Joint Action Water Agency*, 609 N.E.2d 1056, 1061 (Ill. App. Ct. 1993)). *Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345, 1351 (7th Cir. 1995) ("To enter upon another's land without consent is a trespass."). It is "an invasion 'of the exclusive possession and physical condition of land.'" *Colwell Systems, Inc. v. Henson,* 452 N.E.2d 889, 892 (Ill. App. Ct. 1983) (quoting Restatement (Second) of Torts, ch. 7, at 275 (1965)). The plaintiff must also allege "a wrongful interference with his actual possessory rights in the property." *Loftus v.*

*Mingo,* 511 N.E.2d 203, 210 (Ill. App. Ct. 1987); *accord Great Atl. & Pac. Tea Co., Inc. v. LaSalle Nat. Bank,* 395 N.E.2d 1193, 1196 (Ill. App. Ct. 1979). "[T]he intrusion has to be such as to subtract from the owner's use of the property." *Geller v. Brownstone Condominium Assoc.,* 402 N.E.2d 807, 809 (Ill. App. Ct. 1980).

Traditionally, trespass law in Illinois and elsewhere only recognized an *actual* physical invasion by a person or tangible thing.[11] *Chicago & W.I.R. Co. v. Ayres,* 106 Ill. 511, 518 (Ill. 1883) (defining trespass as "an actual physical invasion of the owner's real estate"); *In re Chicago Flood Litig.,* 680 N.E.2d 265, 278 (Ill. 1997) (noting that trespass involves "a crass physical invasion"); Restatement (Second) of Torts, ch. 7, topic 1, scope note (1965) (explaining that the chapter parenthetically titled "Trespass to Land" "deal[s] only with the interest of the possessor in holding his land free from physical intrusions by others[,]" and does not deal with "the invasion of other interests of the possessor of land, such as his interest in its enjoyment free from annoyances other than physical intrusions . . . ."); W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 13, at 71 (1984) ("While it is generally assumed and held that a personal entry is unnecessary for a trespass, the defendant's act must result in an invasion of tangible

---

[11] Courts in some states "have adopted a 'modern' view of trespass that recognizes intangible invasions," such as noise, radiation, or electromagnetic fields, but those courts require the plaintiff to prove physical damage to the property caused by such intangible intrusion. *In re WorldCom, Inc.,* 546 F.3d 211, 217 (2d Cir. 2008) (citing to cases from Colorado, Washington, and Alabama). *See also* 75 Am. Jur. 2d *Trespass* § 29 n.6 (2018) (citing cases from California, Colorado, and Wyoming). In this case, Plaintiff has not alleged the transmission of Defendants' video content caused substantial damage to its property (*see* Doc. 167), meaning that Plaintiff is essentially seeking to apply the modern view to recover for an intangible trespass but without showing that its land was damaged by the alleged invasion. But Plaintiff has not identified a single court of the State of Illinois that has applied the modern view without requiring proof of physical damages to the land (*see* Doc. 184), and the Court did not find any such decision in the course of its own research.

matter. Otherwise, there would be no use or interference with possession."); 75 AM. JUR. 2D *Trespass* § 29 (2018) ("The traditional common law rule, the dimensional test, provides that a trespass only exists where the invasion of land occurs through a physical, tangible object, and under that rule, intangible matter or energy, such as smoke, noise, light, and vibration, are insufficient to constitute a trespass."); 6 TURNER W. BRANCH & MARGARET MOSES BRANCH, LITIGATING TORT CASES § 67:6 (2021) ("A claim of trespass contemplates actual physical entry or invasion.").

Here, the complaint fails to allege facts demonstrating that Defendants caused a physical intrusion, or that the purported physical intrusion interfered with Plaintiff's possession of the rights-of-way. As Defendants stated, video content transmitted through the Internet "is incapable of taking up any physical space that could conceivably interfere with Plaintiff's exclusive possession of the public right-of-way, alter the physical condition of the public right-of-way, or somehow subtract from [Plaintiff's] use of the public right-of-way." (Doc. 175, p. 25; *see also* Doc. 179, p. 46). It is the ISPs' wirelines that are the actual physical intrusion. The internet content that travels through the wirelines has no physical presence. *See Brannan v. Am. Tel. & Tel. Co.*, 362 S.W.2d 236, 241 (Tenn. 1962) (finding that sending radio signals does not amount to an actionable trespass because "[n]o harm is done nor interference with the use of the land created"); *In re MCI, Inc.*, No. 02-13533, 2006 WL 538556, at *4 (Bankr. S.D.N.Y. Feb. 1, 2006) ("'Pulses of light' [through a fiber optic cable] are nothing more than energy radiation of specific frequencies, like radio waves, x-rays, and UHF transmissions, and considering such an energy radiation 'physical' for purposes of trespass law would be inappropriate."). *See*

*also City of Chicago v. F.C.C.*, 199 F.3d 424, 433 (7th Cir. 1999) (upholding FCC's conclusion that ECI was not "using" the public right-of-way to deliver cable television and therefore was not subject to local franchise requirements because even though ECI's signal was transmitted on lines located in the public right-of-way, the lines were previously constructed, owned, and operated by Ameritech, ECI paid Ameritech for use of the lines, and the lines were also available for use by other programmers); *Guidry Cablevision/Simul Vision Cable Sys. v. City of Ballwin*, 117 F.3d 383, 386 (8th Cir. 1997) (citing *In re Definition of a Cable Television Sys.*, 5 FCC Rcd. 7638, 7642 (1990)) ("use" of a public right-of-way does not include "the mere passing over of such a right-of-way by electromagnetic radiation," like radio or infrared waves; *Primeco Pers. Commc'n v. Ill. Commerce Comm'n*, 750 N.E.2d 202, 216 (Ill. 2001) ("the phrase 'use of the public right of way' refers to the physical occupation of those rights-of-way by a telecommunication provider's infrastructure.").

Plaintiff attempts to counter Defendants' argument that there was no physical intrusion by arguing that the Illinois appellate court's decision in *Labell v. City of Chicago* "proves that the Defendants are transmitting a 'thing' because it can be taxed" (Doc. 184, p. 69). *Labell v. City of Chicago*, 147 N.E.3d 732 (Ill. App. Ct. 2019), *petition for leave to appeal denied*, 144 N.E.3d 1175 (Ill. 2020). In *Labell*, taxpayers brought a class action against the City of Chicago challenging the constitutionality of an ordinance imposing an "amusement tax" as it related to internet based streaming services (including Netflix, Hulu, Spotify, and Amazon Prime) delivered to customers with a Chicago address. 147 N.E.3d at 737–38. The Illinois appellate court upheld the amusement tax as constitutional. *Id.* at 747, 749. According to Plaintiff, the holding in *Labell* means that "[a]s a matter of

Illinois law, video streaming service is a 'thing,' which has entered upon, and burdened, the City's public rights-of-way without authorization" (Doc. 184, p. 69).

The Court finds that Plaintiff's reliance on *Labell* is misplaced. The City of Chicago imposed an amusement tax on "charges paid for the privilege of watching electronically delivered television shows, movies, or videos . . . if the shows, movies, or videos are delivered to a patron in the City." *Labell*, 147 N.E.3d at 736. In other words, the "thing" being taxed was the patrons' purchase of or subscription to online shows, movies, or videos. It was not the actual electronic transmission of the online video content that was being taxed. But even if the electronic transmission was the "thing" being taxed, that does not somehow make the transmission a tangible thing capable of physically invading and occupying Plaintiff's land and serving as the basis for a trespass claim. Plaintiff's position, taken to its logical extension, means that every website, online service, and user that provides any type of content on the internet is liable for trespass unless they all obtained explicit permission to do so from Plaintiff and every other municipality (Doc. 175, p. 25). This, of course, is an absurd result and underscores the critical flaw in Plaintiff's trespass theory and why it cannot stand.

For these reasons, Plaintiff's claim for trespass in Count 3 is dismissed pursuant to Rule 12(b)(6) for failure to state a claim. The dismissal is with prejudice because any amendment would be futile given the lack of authority in Illinois allowing claims for intangible trespass that did not cause physical damage to the land.

## C.  UNJUST ENRICHMENT CLAIM (Count 4)

Plaintiff concedes that its unjust enrichment claim is tied to its trespass claim (Doc.

184, pp. 69–70). Because the Court has determined that the trespass claim must be dismissed, so too must the unjust enrichment claim.

### D.  VIOLATION OF EAST ST. LOUIS ORDINANCE § 82-19 (Count 5)

The complaint alleges that Defendants violated East St. Louis Municipal Code § 82-19,[12] (Doc. 167, ¶¶112–27), which is titled "Unlawful resale of cable service" and provides that "[n]o person shall resell cable communication signals or service within the city without, prior to such sale, having obtained written consent and approval of both the operating franchise company and the city." EAST ST. LOUIS, ILL., CODE OF ORDINANCES §82-19 (1983). As Defendants point out, it appears this ordinance was enacted in 1983 to address the theft of cable service, which was a widely recognized problem in the late 1970s and early 1980s (Doc. 179, p. 47). *See* H.R. Rep. No. 98-934, at *83 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4720 ("The Committee is extremely concerned with a problem which is increasingly plaguing the cable industry—the theft of cable service."); 1 DANIEL L. BRENNER ET AL., CABLE TELEVISION AND OTHER NONBROADCAST VIDEO § 5:82 (2022) (indicating theft of service in the cable industry was a problem in the 1980s, estimated to cost cable companies over $500 million a year in 1984).

Defendants once again set forth an array of arguments as to why this claim must fail. The Court will address the arguments that the Municipal Code does not provide Plaintiff with an express or implied right of action and that Plaintiff has not sufficiently alleged Defendants are "reselling" cable television service, each of which are dispositive.

---

[12] A copy of the ordinance is attached to the complaint at Doc. 167-1.

"Like a statute, a municipal ordinance may *expressly* provide for a cause of action to redress a violation of its provisions[.]" *1541 N. Bosworth Condo. Ass'n v. Hanna Architects, Inc.*, ---N.E.3d---, 2021 WL 6135459, *6 (Ill. App. Ct. 2021), *appeal denied*, 187 N.E.3d 704 (Ill. 2022) (emphasis in original). An ordinance can also serve as the basis for an *implied* cause of action. *Id.*

Plaintiff completely failed to counter Defendants' argument that no right of action exists to remedy a code violation (*see* Doc. 184). After reviewing the East St. Louis Municipal Code, the Court agrees with Defendants that §82-19 does not provide an express right of action to remedy a violation. The article (Article 1) and chapter (Chapter 82) in which §82-19 appears also do not provide an express right of action. Nor does the part of the Code dedicated to enforcement. *See* EAST ST. LOUIS, ILL., CODE OF ORDINANCES §§ 2-251 to 2-261. Instead, the Code provides that a violation of §82-19 is punishable as a misdemeanor with a fine and imprisonment, *see id.* at § 1-15, by the "Regulatory Affairs Court," which was established by the Code for "administrative adjudication of violations." *Id.* at §§ 2-241 to 2-261.

The Court also believes it is not necessary to imply a right of action under §82-19. First and foremost, Plaintiff's allegations are insufficient to plausibly suggest that Defendants even violated the ordinance. Plaintiff appears to be alleging that Defendants' use of private peering agreements with the ISPs somehow leads to Defendants "reselling" cable in violation of §82-19 (*see* Doc. 167, ¶¶113–24). But the allegations in the complaint make no connection between such agreements and Defendants' alleged "resale" of video content (*see* Doc. 167). And Plaintiff's response in opposition to the motions to dismiss

failed to address Defendants' argument regarding the insufficiency of the allegations (*see* Doc. 184). Consequently, the Court (and Defendants for that matter) are still completely in the dark as to why Plaintiff thinks Defendants resold video content or how the purported resale scheme actually worked (including, for example, who Defendants bought the video content from, who they allegedly resold it to, or who Defendants needed to obtain consent and approval from as required by § 82-19). "The absence of a violation of a statute (or ordinance) is a death knell for a claim of an implied cause of action" because "[t]he only reason to even consider implying a private right of action in . . . [an] ordinance is to redress a *violation* of that [ordinance]." *1541 N. Bosworth*, 2021 WL 6135459, *8.

Additionally, even if Plaintiff had sufficiently alleged that Defendants violated §82-19, the Court finds that the fourth factor for implying a right of action—the need to provide an adequate remedy for violations of the ordinance—is not satisfied. As previously mentioned, the Code establishes a framework for administrative enforcement and remediation of ordinance violations by the Regulatory Affairs Court. Plaintiff does not argue that this enforcement scheme is somehow inadequate to deter violations of §82-19 (*see* Doc. 184). Because the Code provides an adequate remedy and enforcement process for ordinance violations, the Court declines to recognize an implied right of action. *E.g., 1541 N. Bosworth*, 2021 WL 6135459, *10; (no implied right of action where city "*does* have an enforcement method to redress" ordinance violation) (emphasis in original); *Norwood v. City of Chicago*, No. 18-CV-7270, 2020 WL 5076687, at *2 (N.D. Ill. Aug. 27, 2020) (no right of action because "implying a private cause of action for

27

employees to sue the City is not necessary to provide an adequate remedy for violations" of the ordinance).

For these reasons, Plaintiff's claim in Count 5 is dismissed pursuant to Rule 12(b)(6) for failure to state a claim. The dismissal is with prejudice because any amendment would be futile given that the Code of Ordinances does not provide Plaintiff with a cause of action.

<u>CONCLUSION</u>

The Motions to Dismiss filed by Defendants (Docs. 172, 173, 174, 176, 178) are **GRANTED** and Plaintiff's Amended Class Action Complaint (Doc. 167) is **DISMISSED** in its entirety **with prejudice** for the reasons stated in the body of this Order.

**IT IS SO ORDERED.**

**DATED: September 23, 2022**

<u>s/ Mark A. Beatty</u>
**MARK A. BEATTY**
**United States Magistrate Judge**