No. 22-2905

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

———————

CITY OF EAST ST. LOUIS, Individually and
on behalf of all others similarly situated,

Plaintiff-Appellant,

v.

NETFLIX, INC.; DISNEY PLATFORM DISTRIBUTION, INC.;
APPLE INC.; HULU, LLC; WARNERMEDIA DIRECT, LLC; AMAZON.COM
SERVICES, LLC; CBS INTERACTIVE INC.; YOUTUBE LLC;
CURIOSITYSTREAM, INC.; PEACOCK TV, LLC; DIRECTV, LLC; and DISH
NETWORK, L.L.C.,

Defendants-Appellees.

———————

Appeal from the United States District Court
for the Southern District of Illinois

———————

## BRIEF OF APPELLEE DISH NETWORK L.L.C.

———————

Jared R. Butcher
BERLINER CORCORAN & ROWE LLP
1101 17th St. NW, Suite 1100
Washington, DC 20006
(202) 293-1074

Pantelis Michalopoulos
Matthew R. Friedman
STEPTOE & JOHNSON LLP
1330 Connecticut Ave. NW
Washington, DC 20036
(202) 429-3000

*Counsel for DISH Network L.L.C.*

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-2905

Short Caption: City of East St. Louis v. Netflix, Inc. et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

DISH Network L.L.C.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Steptoe & Johnson LLP; Berliner Corcoran & Rowe LLP; CrossCastle PLLC; Armstrong Teasdale LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

See attached.

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

See attached.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Pantelis Michalopoulos    Date: 11/9/2022

Attorney's Printed Name: Pantelis Michalopoulos

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ✓  No ☐

Address: 1330 Connecticut Ave. NW

Washington, DC 20002

Phone Number: 202-429-6494    Fax Number: 202-429-3902

E-Mail Address: pmichalopoulos@steptoe.com

rev. 12/19 AK

i

**DISH Network L.L.C.**
**Parent Corporations and Publicly Held Companies**

DISH Network L.L.C. is a wholly-owned subsidiary of DISH DBS Corporation, which has publicly-issued debt and is a wholly-owned subsidiary of DISH Orbital Corporation.  DISH Orbital Corporation is a wholly-owned subsidiary of DISH Network Corporation, which has publicly-issued equity.  No other publicly held corporation owns 10% or more of the stock of DISH Network L.L.C.

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As     Clear Form

Appellate Court No: 22-2905

Short Caption: City of East St. Louis v. Netflix, Inc. et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐        **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 DISH Network L.L.C.

_____

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Steptoe & Johnson LLP; Berliner Corcoran & Rowe LLP; CrossCastle PLLC; Armstrong Teasdale LLP

_____

(3)     If the party, amicus or intervenor is a corporation:

i)        Identify all its parent corporations, if any; and

  See attached.

ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

  See attached.

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

Attorney's Signature: /s/ Matthew Friedman          Date: 11/9/2022

Attorney's Printed Name:  Matthew Friedman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☐  No ☑

Address:  1330 Connecticut Ave. NW

   Washington, DC 20002

Phone Number: 202-429-6459                    Fax Number:  202-429-3902

E-Mail Address: mfriedman@steptoe.com

rev. 12/19 AK

### DISH Network L.L.C.
### Parent Corporations and Publicly Held Companies

DISH Network L.L.C. is a wholly-owned subsidiary of DISH DBS Corporation, which has publicly-issued debt and is a wholly-owned subsidiary of DISH Orbital Corporation.  DISH Orbital Corporation is a wholly-owned subsidiary of DISH Network Corporation, which has publicly-issued equity.  No other publicly held corporation owns 10% or more of the stock of DISH Network L.L.C.

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2905

Short Caption: City of East St. Louis v. Netflix, Inc. et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

DISH Network L.L.C.

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Steptoe & Johnson LLP; Berliner Corcoran & Rowe LLP; CrossCastle PLLC; Armstrong Teasdale LLP

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

    See attached

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    See attached

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Jared R. Butcher      Date: 11/15/2022

Attorney's Printed Name: Jared R. Butcher

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [ ]   **No** [✓]

Address: BERLINER CORCORAN & ROWE LLP

1101 17th Street, NW, Ste. 1100, Washington, DC 20036

Phone Number: 202.293.5555      Fax Number: 

E-Mail Address: jbutcher@bcr-dc.com

rev. 12/19 AK

**DISH Network L.L.C.**
**Parent Corporations and Publicly Held Companies**

DISH Network L.L.C. is a wholly-owned subsidiary of DISH DBS Corporation, which has publicly-issued debt and is a wholly-owned subsidiary of DISH Orbital Corporation.  DISH Orbital Corporation is a wholly-owned subsidiary of DISH Network Corporation, which has publicly-issued equity.  No other publicly held corporation owns 10% or more of the stock of DISH Network L.L.C.

## TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENTS ............................................................ i

TABLE OF CONTENTS ................................................................................ vii

TABLE OF AUTHORITIES ........................................................................... viii

I.    JURISDICTIONAL STATEMENT ................................................ 1

II.   STATEMENT OF THE ISSUES ................................................... 1

III.  STATEMENT OF THE CASE ...................................................... 1

IV.   SUMMARY OF THE ARGUMENT ............................................ 4

V.    ARGUMENT ............................................................................ 6

    A.    Standard of Review. ......................................................... 6

    B.    The Illinois Act Does Not Apply to the Streaming Companies. ............ 7

    C.    Application of the Illinois Act to the Streaming Companies Is
          Preempted by the Federal Cable Act. .................................... 17

    D.    The City Impermissibly Relies on a Theory of Collective Responsibility
          and Fails to Allege Specific Facts with Respect to Each Streaming
          Company. ......................................................................... 21

VI.   CONCLUSION ......................................................................... 23

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
    TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENT 24

CERTIFICATE OF SERVICE ......................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Am. Tobacco Co. v. Patterson*,
  456 U.S. 63 (1982) ................................................................ 10

*Atkins v. Hasan*,
  No. 15-CV-203, 2015 WL 3862724 (N.D. Ill. June 22, 2015) ............................... 22

*Bank of Am., N.A. v. Knight*,
  725 F.3d 815 (7th Cir. 2013) ............................................. 6, 21, 22

*Bell v. Publix Super Markets, Inc.*,
  982 F.3d 468 (7th Cir. 2020) .................................................. 6, 19

*City of Ashdown, Ark. v. Netflix, Inc.*,
  565 F. Supp. 3d 1111 (W.D. Ark. 2021), *aff'd*, 52 F.4th 1025 (8th
  Cir. 2022) ....................................................................... 15, 16

*City of Chicago v. FCC*,
  199 F.3d 424 (7th Cir. 1999) ............................................. 4, 12, 13, 20

*City of Creve Coeur v. Netflix, Inc.*,
  No. 18SL-CC02819, 2020 WL 13120428 (Mo. Cir. Ct. Dec. 30, 2020) ................. 16

*City of Dallas v. FCC*,
  165 F.3d 341 (5th Cir. 1999) ................................................... 21

*City of Eugene, Oregon v. FCC*,
  998 F.3d 701 (6th Cir. 2021) ................................................... 20

*City of Ft. Scott v. Netflix, Inc.*,
  No. BB-2021-CV-000166, 2022 WL 16901200 (Kan. Dist. Ct.,
  Bourbon Cnty. Oct. 10, 2022), *appeal filed*, No. 125784 (Kan. Ct.
  App. Nov. 22, 2022) .............................................................. 14

*City of Kenner v. Netflix, Inc.*,
  No. 814-168, 2022 WL 4101746 (La. Dist. Ct., 24th Dist. Aug. 25,
  2022), *aff'd*, --- So. 3d ----, 2023 WL 3216197 (La. Ct. App. May 3,
  2023)........................................................................... 14, 15

*City of Knoxville v. Netflix, Inc.*,
  656 S.W.3d 106 (Tenn. 2022) ................................................ 14, 16

*City of Lancaster v. Netflix, Inc.*,
    No. 21STCV01881, 2022 WL 1744233 (Cal. Super. Ct. Apr. 13,
    2022), *appeal filed*, No. B321481 (Cal. 2d Dist. June 1, 2022) ........................... 14

*City of Maple Heights v. Netflix, Inc.*,
    --- N.E.3d ----, 2022 WL 17331374 (Ohio Nov. 30, 2022) ..................................... 15

*City of Reno, Nevada v. Netflix, Inc.*,
    558 F. Supp. 3d 991 (D. Nev. 2021), *aff'd*, 52 F.4th 874 (9th Cir.
    2022)......................................................................................................................... 16

*Dep't of Com. v. U.S. House of Representatives*,
    525 U.S. 316 (1999) ............................................................................................... 10

*Evans v. Einhorn*,
    855 F.2d 1245 (7th Cir. 1988) ............................................................................. 6, 19

*Fox Television Stations Inc. v. FilmOn X LLC*,
    150 F. Supp. 3d 1 (D.D.C. 2015) ...................................................................... 10, 11

*Gwinnett Cnty. v. Netflix, Inc.*,
    No. 20-A-07909-10, 2022 WL 678784 (Ga. Super. Ct. Feb. 18, 2022),
    *aff'd*, --- S.E.2d ---, 2023 WL 2398217 (Ga. Ct. App. Mar. 8, 2023) ...................... 14

*Horist v. Sudler & Co.*,
    941 F.3d 274 (7th Cir. 2019) ............................................................................... 6, 7

*Jaffke v. Dunham*,
    352 U.S. 280 (1953) ................................................................................................. 7

*Marcus & Millichap Inv. Servs. of Chicago, Inc. v. Sekulovski*,
    639 F.3d 301 (7th Cir. 2011) ................................................................................... 7

*NARUC v. FCC*,
    746 F.2d 1492 (D.C. Cir. 1984) ............................................................................. 19

*Primeco Pers. Commc'ns, L.P. v. ICC*,
    750 N.E.2d 202 (Ill. 2001) ..................................................................................... 13

## Statutes

220 ILCS 5/21-101(d) ................................................................................................. 8

220 ILCS 5/21-101(f) ................................................................................................. 8

220 ILCS 5/21-201(d) ........................................................................................... 17, 18

220 ILCS 5/21-201(e) ............................................................... 17, 18

220 ILCS 5/21-201(f) ............................................................... 17, 18

220 ILCS 5/21-201(u) ............................................................... 17, 18

220 ILCS 5/21-201(v) ............................................................... 5, 15

220 ILCS 5/21-401(a)(1) ........................................................ 2, 8, 14

220 ILCS 5/21-401(e)(1-2) .......................................................... 4, 8

220 ILCS 5/21-601(a) ................................................................. 5, 9

220 ILCS 5/21-801(b) ..................................................................... 2

220 ILCS 5/22-501(b)(3) ............................................................. 5, 9

220 ILCS 5/22-501(f) ................................................................ 5, 10

47 U.S.C. § 521, *et seq.* ............................................................... 1

47 U.S.C. § 522(5) ...................................................................... 18

47 U.S.C. § 522(7) .................................................................. 18, 21

47 U.S.C. § 542(a) ...................................................................... 17

47 U.S.C. § 542(g)(1) ................................................................... 18

47 U.S.C. § 542(g)(2)(A) ............................................................... 18

47 U.S.C. § 556(c) ...................................................................... 18

Tenn. Code Ann. §§ 7-59-301, *et. seq* (2015 & Supp. 2022) ....................... 13

**Administrative Decisions**

Decision, Docket No. 05-06-12, Conn. Dep't of Pub. Util. Control,
*Investigation of the Terms and Conditions Under Which Video
Products May Be Offered by Connecticut's Local Exchange Carriers*
(June 7, 2006),
http://www.dpuc.state.ct.us/dockhistpre1900.nsf/8e6fc37a54110e3e8
52576190052b64d/ab91af8f6b1b5787852582c70066c8cb?OpenDocu
ment; ................................................................................... 11

*Implementation of Section 621(a)(1) of the Cable Commc'ns Pol'y Act of 1984 As Amended by the Cable Television Consumer Prot. & Competition Act of 1992,*
22 FCC Rcd. 5101 (2007) ....................................................................... 19

*Implementation of Section 621(a)(1) of the Cable Commc'ns Pol'y Act of 1984 as Amended by the Cable Television Consumer Prot. & Competition Act of 1992,*
34 FCC Rcd. 6844 (2019) ....................................................................... 19

*Petition for Determination of Effective Competition in 32 Mass. Cmtys. & Kauai, Haw. (HI0011)*, 34 FCC Rcd. 10229 (2019) ............................ 9

**City Ordinances**

East St. Louis Municipal Ordinance § 82-19 .................................................. 3

**Rules and Regulations**

47 C.F.R. § 76.1500(a) .................................................................................. 21

**Other Authorities**

Kevin E. McCarthy, Office of Legislative Research, Conn. Gen. Assembly, *Cable TV Competition,* Research Report 2008-R-0458 (Aug. 19, 2008) ...................................................................................... 12

Michael Maciag, Number of Local Governments by State, Governing, https://www.governing.com/archive/number-of-governments-by-state.html (updated Sept. 14, 2012) ...................................................... 9

Linda Haugsted, *Okla. Telcos Don't Need Video Franchises*, Multichannel News, https://www.multichannel.com/news/okla-telcos-don-t-need-video-franchises-270340 (May 9, 2006) .................................... 11

Robert W. Crandall, et al., *Does Video Delivered Over a Telephone Network Require a Cable Franchise?*, 59 Fed. Comm. L.J. 251 (2007) ....................................................................................................
............................................................................. 10, 11, 12, 13

## I.     JURISDICTIONAL STATEMENT

In accordance with Circuit Rule 28(b), Defendant-Appellee DISH Network L.L.C. ("DISH") states that the Amended Jurisdictional Statement filed by the City of East St. Louis (the "City"), on March 8, 2023, is complete and correct.

## II.     STATEMENT OF THE ISSUES

1.     Whether the City's claims would also be dismissed for failure to state a claim under the Cable and Video Competition Law of 2007 ("Illinois Act" or "Act") because the Defendants-Appellees DISH, Netflix, Inc., Disney Platform Distribution, Inc., Apple Inc., Hulu, LLC, WarnerMedia Direct, LLC, Amazon.com Services, LLC, CBS Interactive Inc., YouTube LLC, CuriosityStream, Inc., Peacock TV, LLC, and DIRECTV, LLC (the "Streaming Companies") do not install, construct, or maintain equipment and facilities in the public rights of way.

2.     Whether the City's claims are, in any event, preempted by the federal Cable Communications Policy Act of 1984, as amended by the Telecommunications Act of 1996 (the "federal Cable Act"), 47 U.S.C. § 521, *et seq.*

3.     Whether the City's claims would also be dismissed for failure to state a claim under the Illinois Act because it failed to allege any specific facts as to any of the Streaming Companies other than Netflix and Hulu.

## III.     STATEMENT OF THE CASE

The Illinois Act requires permission from the Illinois Commerce Commission for a company to "use, occupy, and construct" networks on public rights of way for delivering video programming to Illinois residents.  This permission—called a state-

1

issued authorization—is necessary for cable and telephone companies, which construct and operate local lines—cables and wires—through the public rights of way owned by the local governments in Illinois. *See* 220 ILCS 5/21-401(a)(1). In exchange for giving permission to construct such infrastructure facilities on public lands, the local governments receive "service provider fees" from the cable and telephone companies. *See* 220 ILCS 5/21-801(b).

The Streaming Companies offer paid video content services throughout the United States, including Illinois. In doing so, they do not run lines or otherwise construct or operate infrastructure facilities in local public rights of way. Dkt. 177 at 1.

Since 1996, DISH has offered direct-to-home satellite service, *i.e.*, programming that DISH transmits from satellites in outer space directly to its subscribers' premises throughout the United States, including Illinois. In addition to satellite programming, DISH subscribers who have their own broadband Internet service and their own Internet-connected devices can use the DISH Anywhere app or the DISH Anywhere website to access certain video content and ancillary live TV channels over the public Internet. *See* App. 33 (Dkt. 167 ¶ 37).[1] This streaming video

---

[1] Where applicable, record citations are to the City's "Required Short Appendix." Because the City's appendix is not separately paginated (apart from the first page of documents included in the appendix), this brief also cites the corresponding District Court docket entries and pagination. Thus, the "Amended Class Action Complaint" ("Amended Complaint") and the District Court's "Memorandum and Order" are cited as "App. 33 (Dkt. 167 ¶ __)" and "App. 75 (Dkt. 206 at __)," respectively. Other citations to the District Court record are to the "Dkt." entry.

content is called over the top because it is provided to subscribers exclusively through their own Internet connection, "over the top," as part of the massive flow of data that makes up the public Internet. Dkt. 177 at 12. For subscribers who request video content when not using a mobile service, that content travels over the last-mile wires, poles, conduits, and other infrastructure of the local cable or telephone companies in their capacities as Internet service providers ("ISPs"). *Id.* at 14. Since 2015, a DISH subsidiary—Sling TV L.L.C. ("Sling TV")—has also offered subscribers access to over the top streaming of live TV based on the same "bring-your-own-broadband" model: the customer relies on her own broadband access service, and pays for that service, to access Sling TV's content over the top.

The City filed this putative class action against the Streaming Companies, seeking to apply the Illinois Act—for the first time in history—to over the top streaming services. App. 33 (Dkt. 167 ¶¶ 1-5). The City also asserted claims for trespass, unjust enrichment, and violation of East St. Louis Municipal Ordinance § 82-19. *Id.* (Dkt. 167 ¶¶ 98-127). The Streaming Companies moved to dismiss the lawsuit on the grounds, among other things, that the City lacked a private cause of action and that it sought to broaden the meaning of "video service," as used by the Illinois Act, beyond what is allowed by the legislative language, the intent of the Illinois legislature, federal law, and the United States Constitution. Dkt. 172, 173,

174, 176, 178.  The District Court[2] granted the motions and dismissed all claims with prejudice.  App. 75 (Dkt. 206 at 1–2, 28).

## IV.    SUMMARY OF THE ARGUMENT

Even aside from the District Court's rationale, affirmance of the District Court's dismissal of the City's claims under the Illinois Act is warranted on the merits.

First, the Streaming Companies do not "*use, occupy, and construct* facilities in the public rights-of-way for *the delivery of . . . video service* in the service area footprint[.]"    220 ILCS 5/21-401(e)(1-2) (emphasis added).    The City tries to manufacture "use" of the public rights of way out of the trips of streamed content over the cable and telephone companies' lines, among the billions of bits that make up the Internet.    But this Court's decision in *City of Chicago v. FCC* has conclusively affirmed the Federal Communications Commission ("FCC") in holding that such a trip does not amount to use: "[i]t seems incontrovertible that in some important and historical sense of the word, it is reasonable to conclude that [a non-facilities-based provider] has not 'used' the public right-of-way."  199 F.3d 424, 433 (7th Cir. 1999). This reading is confirmed by, and is the only one that can be reconciled with, other requirements in the Act that only make sense when applied to companies that construct and operate their own networks: carrying public, educational, and government ("PEG") channels; maintaining customer service facilities in every

---

[2] Magistrate Judge Mark A. Beatty, acting with all parties' consent.  *See* Am. Jurisdictional Statement 10–11 (Mar. 8, 2023).

Illinois municipality; and connecting lines and providing free basic services to public buildings. *See* 220 ILCS 5/21-601(a); 220 ILCS 5/22-501(b)(3); 220 ILCS 5/22-501(f).

Moreover, even assuming the Streaming Companies provide "video programming," it falls within the "public Internet" exception to the definition of "video service." The Streaming Companies qualify for that exception because their video content is "provided solely as part of, and via, service that enables users to access content, information, electronic mail, or other services offered over the public Internet." 220 ILCS 5/21-201(v). The City is wrong that the public Internet exception was meant to cover Internet access providers, to the exclusion of everyone else. *See* City Br. 8 (citing App. 33 (Dkt. 167 ¶ 52)). As courts in Ohio, Louisiana, Arkansas, and Nevada have found in interpreting the "public Internet" exceptions contained in the nearly identical statutes of those states, over the top streaming services are accessed over the public Internet, and therefore qualify for the exception.

Second, the Illinois legislature was also limited by federal law. Applying the Illinois Act to non-facilities-based companies that do not use their own facilities to cross the public rights of way, and do not need to dig up the streets or otherwise burden local infrastructure, would be inconsistent with, and preempted by, the federal Cable Act. The federal Cable Act limits franchise fees to entities that operate cable systems, defines cable systems as ones using the public rights of way, and preempts inconsistent state or local laws. The City has not alleged, and cannot allege, that any of the Streaming Companies own or operate a system that uses the public rights of way in Illinois. Issues of federal preemption are matters of law that are

5

properly addressed at the motion to dismiss stage. *See Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 475-76 (7th Cir. 2020); *Evans v. Einhorn*, 855 F.2d 1245, 1250 (7th Cir. 1988).

Third, the Amended Complaint is devoid of substantive allegations regarding what conduct by most of the Streaming Companies allegedly gives rise to the City's claims. Most of the allegations are "shotgun pleadings" directed generally to all the defendants, which are improper because "[e]ach defendant is entitled to know what [it] did that is asserted to be wrongful." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). The Amended Complaint fails to identify any allegation of public right of way use specifically directed to any Streaming Company other than Netflix and Hulu. App. 33 (Dkt. 167 ¶¶ 40-45, 55, 64-67 (discussing Netflix); *id.* ¶ 56 (discussing Hulu)).

## V.    ARGUMENT

Even apart from the District Court's unimpeachable ruling that the City has no private right of action, dismissal is also warranted on each of the merits grounds not reached by the lower court, including, among others: (1) the Illinois Act does not apply to the Streaming Companies; (2) application of the Illinois Act to the Streaming Companies is preempted by federal law; and (3) the City failed to allege any specific facts as to any of the Streaming Companies other than Netflix and Hulu.

### A.    Standard of Review.

This Court reviews a dismissal order de novo. *Horist v. Sudler & Co.*, 941 F.3d 274, 278 (7th Cir. 2019). Dismissal is appropriate where "the allegations in the

complaint [fail to] plausibly suggest a right to relief . . . above a speculative level." *Id.* at 278–80. "A successful party in the District Court may sustain its judgment on any ground that finds support in the record." *Jaffke v. Dunham*, 352 U.S. 280, 281 (1953); *see Marcus & Millichap Inv. Servs. of Chicago, Inc. v. Sekulovski*, 639 F.3d 301, 312 (7th Cir. 2011) ("It is well established that [this Court] may affirm the result below on any basis that appears in the record, even if it was not the district court's ground for dismissing the suit.").

## B.     The Illinois Act Does Not Apply to the Streaming Companies.

Even if the City has a private right of action, which it does not, its claims are precluded by the scope of the Illinois Act.

*The statutory provisions on their face.* The City alleges that the law applies to the Streaming Companies because they "*transmit* their programming through wireline facilities located at least in part on public rights-of-way[.]" App. 33 (Dkt. 167 ¶ 2) (emphasis added). But the Amended Complaint crucially admits that these facilities are "owned and operated by a third party." *Id.* ¶ 60. This trip through another company's facilities among a trillion of other "passengers"—the cornucopia of bits that make up the Internet—is not enough. It is not enough under the Illinois Act; and it is not enough under relevant precedent.

The authorization required by the Illinois Act is inextricably linked to building or operating facilities in the public rights of way. The authorization "shall contain or include" a grant of authority to "provide . . . video service in the service area footprint," and to "*use, occupy, and construct* facilities in the public rights-of-way for *the delivery*

*of . . . video service* in the service area footprint[.]"  220 ILCS 5/21-401(e)(1-2) (emphasis added).  The obvious reading is that the only video service for which authorization is needed is the service that needs to use, occupy, and construct facilities in the public rights of way to deliver its video.  Without any of these activities, no authorization is needed, and the obligations that the Illinois Act imposes on authorization holders are inapplicable.

*The Illinois Act's purpose.*  The plain language of the Act comports with its stated purpose—to enable the rapid and widespread entry of facilities-based providers of video programming into the Illinois market.  *See* 220 ILCS 5/21-101(d) ("further entry by *facilities-based* providers could benefit consumers"), and (f) ("[t]he State authorization process and uniform standards in this Article are intended to enable rapid and widespread entry by competitive providers, which will bring to Illinois consumers . . . the benefits of *new infrastructure investments . . .*") (emphasis added).  Indeed, the Act covers cable and landline telephone companies that dig up the City's streets and install "facilities"—ducts, poles, cables and equipment—in its neighborhoods precisely because they "use the public rights-of-way for the installation or construction of facilities for the provision of cable service or video service[.]"  220 ILCS 5/21-401(a)(1).

*Other statutory provisions.*  This reading is buttressed by other provisions that only make sense when applied to cable and phone companies that construct and operate their own networks.  State-wide authorization holders must carry no fewer public, educational, and government ("PEG") channels than do legacy cable operators

under franchising agreements that pre-dated the Illinois Act. *See* 220 ILCS 5/21-601(a). It is outlandish to suggest that the Illinois legislature intended to impose these granular, localized obligations on national companies lacking local infrastructure. Illinois has 2,828 local government units—the most of any state.[3] Asking every one of the dozens or hundreds of streaming services available in Illinois to carry, for example, Chicago Access Network Television, would be a needless overreach; multiplying that burden by imposing the same carriage obligation for every other Illinois municipal PEG channel reaches exponentially higher levels of absurdity. The limited scope of the law is also manifest in the requirement of maintaining a brick-and-mortar customer service facility within the boundary of each city, village, incorporated town, or county, 220 ILCS 5/22-501(b)(3), which would impose a massive burden on streaming services that are not physically present in specific service areas, since they can be similarly accessed in any location with an Internet connection. *See Petition for Determination of Effective Competition in 32 Mass. Cmtys. & Kauai, Haw. (HI0011)*, 34 FCC Rcd. 10229, 10234 ¶ 8 (2019) (streaming services "do not need to install physical infrastructure to reach" subscribers.). If that physical presence requirement applied to them, Illinois would essentially be taking it upon itself to force these fundamentally online companies into a new storefront-in-every-hamlet incarnation. *See* Dkt. 177 at 8.

---

[3] Michael Maciag, Number of Local Governments by State, Governing, https://www.governing.com/archive/number-of-governments-by-state.html (updated Sept. 14, 2012).

The obligation to connect lines and provide free basic services to public buildings is another example of an irreconcilable disconnect with streaming services, which have no lines and no basic cable packages to offer. 220 ILCS 5/22-501(f); *see* App. 33 (Dkt. 167 ¶ 35) (the Streaming Companies "deliver their content to subscribers directly through a local ISP . . . ."). It would be unreasonable—and it surely was not intended by the legislature—to make the Streaming Companies responsible for someone else's network in this fashion. *See Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982) ("Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible.").

*The legislative background.* The "context in which [the law] appears" further corroborates its focus on facilities-based providers that use the public rights of way to construct and operate facilities for providing cable service or video service. *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 339 (1999). In the mid-2000s, federal and state lawmakers were focused on the efforts of landline telephone companies—chiefly AT&T and Verizon—to compete against cable operators with their own multi-channel video offerings. *See* Robert W. Crandall, et al., *Does Video Delivered Over a Telephone Network Require a Cable Franchise?*, 59 Fed. Comm. L.J. 251, 253 (2007). To do so, they laid fiber lines directly to homes and introduced Internet protocol television ("IPTV") service, which used a dedicated transmission path separate from the public Internet. *See Fox Television Stations Inc. v. FilmOn X LLC*, 150 F. Supp. 3d 1, 28 n.21 (D.D.C. 2015) ("AT&T U-verse and Verizon FiOS do not stream video programming over the Internet as FilmOn X does. To the contrary,

AT&T U-verse and Verizon FiOS deliver content to local communities through closed and managed networks that were built for this precise purpose.") (internal citation omitted).

AT&T's predecessor, Southwestern Bell, had taken the position that, even though it placed its infrastructure in the public right-of way, they did not qualify as cable systems and therefore were not subject to local cable franchising requirements. Some states agreed. *See* Decision, Docket No. 05-06-12, Conn. Dep't of Pub. Util. Control, *Investigation of the Terms and Conditions Under Which Video Products May Be Offered by Connecticut's Local Exchange Carriers* (June 7, 2006), http://www.dpuc.state.ct.us/dockhistpre1900.nsf/8e6fc37a54110e3e852576190052b6 4d/ab91af8f6b1b5787852582c70066c8cb?OpenDocument; Linda Haugsted, *Okla. Telcos Don't Need Video Franchises*, Multichannel News, https://www.multichannel.com/news/okla-telcos-don-t-need-video-franchises-270340 (May 9, 2006). But many local cable franchising authorities and some other states disagreed, triggering a nationwide debate. Crucially, the arguments in favor of requiring the telephone companies to obtain a State-issued authorization focused on their facilities. *See FilmOn X LLC*, 150 F. Supp. 3d at 28 n.21.

The Illinois Act, like similar laws in other states, reflects a compromise among stakeholders—the states, the cities, the cable operators, and the telephone companies. Under these laws, the telephone companies acquiesced to certain traditional cable franchise requirements, so long as franchising authority was granted at the state, not just the local, level. *See* Crandall, 59 Fed. Comm. L.J. at

256 n.21; Kevin E. McCarthy, Office of Legislative Research, Conn. Gen. Assembly, *Cable TV Competition,* Research Report 2008-R-0458 (Aug. 19, 2008) (surveying the statutes of 17 states, including the Illinois Act). No one then or now, including the Illinois Commerce Commission, has suggested that the Act applies more broadly than to the facilities-based cable and telephone companies.

*Court precedent on use.* As seen, unlike the City, the legislative initiatives that produced the Illinois law never equated "use" of the public rights of way with the transfer of bits over facilities constructed or operated by someone else. This Court has previously reached that same conclusion—that the mere "transmission" of signals over another entity's network of cables and telephone wires does not implicate the local government interest in regulating the use of its right of way. Faced with a similar situation in *City of Chicago*, this Court posed the question: "[W]hat exactly does 'using' mean?" 199 F.3d at 432. The Court proceeded to answer the question by identifying the facts that might establish use of the public right-of-way for purposes of triggering local franchise requirements. *Id.* This Court observed that, "when the average person thinks of the construction of a cable system, he thinks of the installation of cables, either on poles or underground. That this sort of construction is highly intrusive on local governments *is a large part of the reason for the local franchising requirement*." *Id.* at 433 (emphasis added). This Court also agreed with the FCC's rationale that "cable makes use of streets and ways" and that "local authorities are able to bring a special expertness to such matters, for example, as how best to parcel large urban areas into cable districts." *Id.* (cleaned up). This Court

12

then concluded that the service provider in that case did not "use" the public right-of-way because its system did not require "construction of a cable system" and, instead, made use of a previously constructed system operated by another company. *Id.* In the Court's words, "[i]t seems incontrovertible that in some important and historical sense of the word, it is reasonable to conclude that [a non-facilities-based provider] has not 'used' the public right-of-way." *Id.* The Illinois Supreme Court reached the same conclusion when construing a similar state statute, the Telecommunications Municipal Infrastructure Maintenance Fee Act, which imposed certain fees on telecommunications providers: "use of the public right of way" means "physical occupation of the public rights-of-way" because historically "the only reason a [provider] would pay a franchise fee was to access the public rights-of-way [to] instal[l] or maintai[n] certain parts of its infrastructure." *Primeco Pers. Commc'ns, L.P. v. ICC*, 750 N.E.2d 202, 216 (Ill. 2001).

Many courts in other states have relied on the same reasoning as *City of Chicago* and *Primeco* in dismissing complaints against streaming companies under indistinguishable laws in those states. In November 2022, the Tennessee Supreme Court found that Netflix and Hulu did not provide "video service" under the Tennessee Competitive Cable and Video Services Act, codified at Tenn. Code Ann. §§ 7-59-301, *et. seq* (2015 & Supp. 2022)). In doing so, the Tennessee Supreme Court particularly noted that the reasoning of *City of Chicago* "is instructive, and [] supports [the] conclusion that entities providing video programming via a third-party's

facilities located in the public rights-of-way are not required to obtain a franchise." *City of Knoxville v. Netflix, Inc.*, 656 S.W.3d 106, 114 (Tenn. 2022).

The Tennessee Supreme Court also looked to prior decisions by courts in "[o]ther States [that] have statutes similar to Tennessee's"—Georgia, California, Louisiana, and Kansas—which had likewise concluded that "the provision of 'video service' does not include transmission of programming via third-party-operated facilities." *Id.* at 113 (citing *Gwinnett Cnty. v. Netflix, Inc.*, No. 20-A-07909-10, 2022 WL 678784, at *6-7 (Ga. Super. Ct. Feb. 18, 2022), *aff'd on other grounds*, --- S.E.2d -‑--, 2023 WL 2398217 (Ga. Ct. App. Mar. 8, 2023), *pet. for cert. filed*, No. S23C0768 (Ga. Mar. 28, 2023); *City of Lancaster v. Netflix, Inc.*, No. 21STCV01881, 2022 WL 1744233, at *8-9 (Cal. Super. Ct. Apr. 13, 2022), *appeal filed*, No. B321481 (Cal. 2d Dist. June 1, 2022); *City of Kenner v. Netflix, Inc.*, No. 814-168, 2022 WL 4101746, at *1 (La. Dist. Ct., 24th Dist. Aug. 25, 2022), *aff'd*, --- So. 3d ----, 2023 WL 3216197 (La. Ct. App. May 3, 2023); *City of Ft. Scott v. Netflix, Inc.*, No. BB-2021-CV-000166, 2022 WL 16901200, at *3 (Kan. Dist. Ct., Bourbon Cnty. Oct. 10, 2022), *appeal filed*, No. 125784 (Kan. Ct. App. Nov. 22, 2022). As in those cases, the Streaming Companies do not "use the public rights-of-way for the installation or construction of facilities for the provision of cable service or video service," 220 ILCS 5/21-401(a)(1), and are not covered by the Illinois Act.

*The public Internet exception.* Even if "transmission" of signals by third parties alone could implicate the Illinois Act, over the top streaming services nonetheless would be exempted from video service provider fees under the Act's public Internet

exception for "video programming provided solely as part of, and via, service that enables users to access content, information, electronic mail, or other services offered over the public Internet."  220 ILCS 5/21-201(v).  As the Ohio Supreme Court has ruled under an almost identical law, "[b]ecause [the Streaming Companies] provide online-streaming services over the public Internet, they are not video-service providers."  *City of Maple Heights v. Netflix, Inc.*, --- N.E.3d ----, 2022 WL 17331374, at *4 (Ohio Nov. 30, 2022);[4] *see City of Kenner*, 2022 WL 4101746, at *1, *aff'd on other grounds*, --- So. 3d ----, 2023 WL 3216197 (La. Ct. App. May. 3, 2023) ("Defendants' content is accessed by their customers over the networks of third-party Internet service providers, whose service allows Defendants' customers to access content over the public Internet, *i.e.* the Internet.").  Indeed, in the words of an Arkansas district court, that exception applies here because a:

> plain and sensible reading of the statute reveals that the exclusion applies to any video programming provided as part of a service.  Video programming is a part of a service that [the Streaming Companies] provide, regardless of whether [they] provide multiple services or just one service.

---

[4] Under the nearly-identical version of Ohio's "public Internet" exception that was in effect at the time of the Ohio Supreme Court's ruling, the term "video service" excluded "video programming provided solely as part of and via a service that enables users to access content, information, electronic mail, or other services offered over the public internet."  *See City of Maple Heights*, 2022 WL 17331374, at *4.

*City of Ashdown, Ark. v. Netflix, Inc.*, 565 F. Supp. 3d 1111, 1116 (W.D. Ark. 2021), *aff'd on other grounds*, 52 F.4th 1025 (8th Cir. 2022).  And, as the district court in Nevada concluded:

> nothing in [the] definition [of "public"] states or suggests paying a fee renders the "Internet" not public.  As Netflix points out in [its] reply— and the Court agrees—public parks are for the use and benefit of all, and merely requiring an individual to pay an entrance fee for park access does not make it less—or not—"public."

*City of Reno, Nevada v. Netflix, Inc.*, 558 F. Supp. 3d 991, 997 (D. Nev. 2021), *aff'd on other grounds*, 52 F.4th 874 (9th Cir. 2022).  For that reason, the *Reno* court rejected Reno's argument that the public internet exception is not met because "Defendants' subscribers can access Defendants' offerings 'using an Internet-connected device,'" *id.*, the same argument that the City is pressing before this Court.  *See* App. 33 (Dkt. 167 ¶ 38) (streaming services are not offered over the public Internet because they are "privately offered only to paying subscribers").[5]

In addition, the City's contention below that the public Internet exception applies to ISPs, and that it covers them to the exclusion of everyone else, City Br. 8

---

[5] Nor is the solitary decision by a Missouri lower court denying a city's motion to dismiss on the public Internet exception persuasive.  *See City of Creve Coeur v. Netflix, Inc.*, No. 18SL-CC02819, 2020 WL 13120428, ¶ 23 (Mo. Cir. Ct. Dec. 30, 2020).  No other court has agreed with this conclusion.  In fact, in finding that streaming services did not fall under Tennessee's video franchise statute, the Tennessee Supreme Court specifically found the Missouri court's analysis to be not "helpful."  Among other reasons, the Missouri trial court "engaged in no serious analysis of the phrase 'provision ... through wireline facilities' in the statutory definition of 'video service' and focused instead on whether allegations about the defendants' streaming content satisfied the meaning of 'video programming.'"  *City of Knoxville*, 656 S.W.3d at 114.

(citing App. 33 (Dkt. 167 ¶ 52)), is based on the theory that Illinois legislators copied, without attribution, a smorgasbord of irrelevant federal definitions of Internet access. Dkt. 184 at 23-25.  Elsewhere in the Illinois Act, the legislature was explicit when it incorporated the federal definitions of "video programming," "cable operator," "cable service," and "cable system" from the federal Cable Act.  *See* 220 ILCS 5/21-201(d), (e), (f), and (u) ("as defined in . . . 47 U.S.C. [§] 522.").  In any event, like the namesake cities in *Ashdown* and *Reno*, never provided any indication of mechanical copying from sundry federal documents, and did not account for significant differences in phrasing between the state and cherry-picked federal passages.

And ultimately, the argument is fatally counter-intuitive: why would lawmakers intent on requiring compensation for the use of public rights of way by the cable and telecommunications companies contradict that intent by introducing an exception whose only effect is to protect those very companies?  In each city, whether in Illinois or the entire nation, it is the cable and telephone companies that provide Internet access and would be the exception's exclusive beneficiaries under the City's reading below—a paradigmatic exception that swallows the rule.

### C.     Application of the Illinois Act to the Streaming Companies Is Preempted by the Federal Cable Act.

This Court should also affirm the District Court because application of the Illinois Act to the Streaming Companies is preempted by the federal Cable Act.  The federal Cable Act makes clear that franchise fees are fees for constructing and maintaining physical infrastructure in public rights of way.  A "cable operator" is

17

defined as "any person . . . who provides cable service over a cable system . . . ." 47 U.S.C. § 522(5). A "cable system," in turn, requires using the public rights of way. *See* 47 U.S.C. § 522(7) ("['Cable system'] does not include . . . a facility that serves subscribers without using any public right-of-way[.]"). It is in exchange for being permitted to tear up sidewalks, erect poles, and bury and string wires in public rights of way that cable providers "may be required under the terms of any franchise to pay a franchise fee." *See* 47 U.S.C. § 542(a); 47 U.S.C. §§ 522(5), (7) (defining cable operator and cable system as those that "serv[e] subscribers . . . using . . . [the] public right-of-way," *inter alia*). A "franchise fee" includes any kind of assessment imposed by a local government "on a cable operator or cable subscriber . . . solely because of their status as such." 47 U.S.C. § 542(g)(1). Federal law also defines what a franchise fee is *not*: it is not "any tax, fee, or assessment of general applicability." 47 U.S.C. § 542(g)(2)(A). The federal Cable Act *expressly* preempts—the strongest form of federal preemption—any "provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent . . . ." 47 U.S.C. § 556(c). These federal provisions preempt local and state franchise requirements on any facility "that serves subscribers without using any public right-of-way." 47 U.S.C. § 522(7).

The Illinois Act, for its part, directly incorporates core definitions from the federal Cable Act. Under the Illinois Act, as noted above, "video programming," "cable operator," "cable service," and "cable system" each mean those "term[s] as defined in . . . 47 U.S.C. [§] 522." 220 ILCS 5/21-201(d), (e), (f), and (u).

Issues of federal preemption are matters of law that are properly addressed at the motion to dismiss stage. *See Bell*, 982 F.3d at 475-76; *Evans*, 855 F.2d at 1250. The FCC—to which Congress has "totally entrusted" regulation of "[i]nterstate communications," *NARUC v. FCC*, 746 F.2d 1492, 1498 (D.C. Cir. 1984)—has repeatedly concluded that local franchising authorities, like the City here, are preempted from applying franchise requirements to non-cable services. In 2007, the FCC ruled that "[local franchising authorities'] jurisdiction applies only to the provision of cable services over cable systems" and that deployment of non-cable services "does not trigger the obligation to obtain a cable franchise." *Implementation of Section 621(a)(1) of the Cable Commc'ns Pol'y Act of 1984 As Amended by the Cable Television Consumer Prot. & Competition Act of 1992*, 22 FCC Rcd. 5101, 5155 ¶ 121 (2007). Subsequently, the FCC clarified that the federal Cable Act "does not permit franchising authorities to extract fees or impose franchise or other requirements on cable operators insofar as they are providing services other than cable services" and "expressly preempt[ed] any state or local requirement, whether or not imposed by a franchising authority, that would impose obligations on franchised cable operators beyond what [the federal Cable Act] allows." *Implementation of Section 621(a)(1) of the Cable Commc'ns Pol'y Act of 1984 as Amended by the Cable Television Consumer Prot. & Competition Act of 1992*, 34 FCC Rcd. 6844, 6889 ¶ 80 (2019). On appeal, the Sixth Circuit agreed, finding that a "license fee" imposed by a city on a cable operator's broadband services "is merely the exercise of its franchise power by another

name" that "is not 'consistent with' [the federal Cable Act] and is therefore preempted." *City of Eugene, Oregon v. FCC*, 998 F.3d 701, 715 (6th Cir. 2021).

These decisions are dispositive here: non-cable services are not subject to franchise fees or other exercises of franchise authority. The focus of this express preemption is on the franchise power of the local government, which cannot extend to non-cable services no matter what sort of entity offers the services. There would be a giant loophole in the federal Cable Act's preemption provision if state and local governments could circumvent it by simply redefining categories of service providers as something other than "cable operators," and then asserting their franchise authority at will over the newly defined categories. Absurd results would also occur: fees would not apply to the non-cable services offered by cable operators that, in this Court's words, place "highly intrusive" demands on the local public rights of way by digging up streets and installing wires and cables, *City of Chicago*, 199 F.3d at 433, but would apply to non-cable services offered by other entities that do not do this. If franchise fees are preempted as to the former, then *a fortiori* they are preempted as to the latter.

Here, the City does not even try to dispute that the Streaming Companies' services are non-cable services. Instead, the City incorrectly contends that its franchise authority is unfettered precisely because of the Streaming Companies' status *as* non-cable companies. Dkt. 184 at 31 ("But there is nothing in the Communications Act that prohibits state or local governments from establishing local franchise requirements for **video service** providers who are **not cable operators**.")

(emphasis in original). The only authority cited by the City, however, is *City of Dallas v. FCC*, which is irrelevant because it pertains to the FCC's assertion of franchising authority over "open video systems." *City of Dallas v. FCC*, 165 F.3d 341, 346 (5th Cir. 1999). These are *facilities*-based systems that, by definition, do provide cable service under the federal Cable Act: "open video systems" are defined as "facilit[ies] consisting of a set of transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service . . . ." 47 C.F.R. § 76.1500(a). This means that the exception to the federal Cable Act for systems "that serve[] subscribers without using any public right-of-way," 47 U.S.C. § 522(7), still applies. No one, not even the City, alleges that any of the Streaming Companies are providing a cable or open video system in Illinois.

Finally, even if Congress had not preempted with words, it would have done so implicitly, as persuasively argued by a number of defendants below. *See* Dkt. 179 at 41-43.

### D. The City Impermissibly Relies on a Theory of Collective Responsibility and Fails to Allege Specific Facts with Respect to Each Streaming Company.

Dismissal is warranted because the Amended Complaint is impermissibly based on a conclusory theory of collective responsibility, without sufficient factual allegations as to each Streaming Company. As this Court has emphasized, "[l]iability is personal," and "[e]ach defendant is entitled to know what [it] did that is asserted to be wrongful." *Knight*, 725 F.3d at 818. "Details about who did what are not merely nice-to-have features of an otherwise-valid complaint; to pass muster under Rule 8 of

the Federal Rules of Civil Procedure, a claim to relief must include such particulars."
*Atkins v. Hasan*, No. 15-CV-203, 2015 WL 3862724, at *2 (N.D. Ill. June 22, 2015)
(citing *Knight*, 725 F.3d at 818).

Here, the City's claims are of the shotgun variety, propped up by baseless "on
information and belief" statements that apply to "some or all Defendants."  A central
component of this strategy is a series of allegations that the Streaming Companies
have skirted the obligation to pay franchise fees through peering agreements that
facilitate direct connections to purportedly private networks run by ISPs.  *See* App.
33 (Dkt. 167 ¶¶ 57-58, 63-69); *see also* City Br. 6-7.  But rather than alleging what
each Streaming Company purportedly is liable for, the City focuses its deficient
allegations on Netflix, with only a single paragraph addressing Hulu and no
allegations regarding any other Streaming Company.  *See* App. 33 (Dkt. 167 ¶¶ 40-
45, 55, 64-67 (discussing Netflix); *id.* ¶ 56 (discussing Hulu).  Indeed, no other
Streaming Company is mentioned by name, and no factual allegations are offered to
establish which defendants are included among the "some or all Defendants" that
allegedly violate the Act, and which are not.  These implausible "on information and
belief" allegations regarding peering agreements are central to all of the City's alleged
claims that the Streaming Companies: violated the Illinois Act (*id.* ¶¶ 68, 80, 89,
Counts I & II); trespassed and were unjustly enriched (*id.* ¶¶ 102, 106, Counts III &
IV); and violated its local ordinance regarding resale of cable services (*id.* ¶¶ 115, 123,
Count V).  Therefore, each claim necessarily fails as to Sling and most of the other
defendants and should be dismissed.

## VI.    CONCLUSION

For these reasons, the Court should affirm the District Court's dismissal of the

Amended Complaint.

Dated: May 4, 2023.

Respectfully submitted,

*/s/ Pantelis Michalopoulos*
Pantelis Michalopoulos
Matthew R. Friedman
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: (202) 429-3000
Fax: (202) 429-3902
pmichalopoulos@steptoe.com
mfriedman@steptoe.com

Jared R. Butcher
BERLINER CORCORAN & ROWE
LLP
1101 17th St., NW, Suite 1100
Washington, DC 20006
Telephone: (202) 293-1074
jbutcher@bcr-dc.com

*Counsel for DISH Network L.L.C.*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENT**

1.  This brief complies with the type-volume limitations of Fed. R. App. P.
    29(a)(5) and 32(a)(7)(B) because, excluding the parts of the document
    exempted by Federal Rule of Appellate Procedure 32(f), it contains 6,001
    words, as determined by the word count function of Microsoft Word.

2.  This brief complies with the typeface requirements of Federal Rule of
    Appellate Procedure 32(a)(5) and Circuit Rule 32(b) and the type-style
    requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared
    in a proportionally spaced typeface using Microsoft Word in 12-point Century
    Schoolbook font.

Dated: May 4, 2023

*/s/ Matthew R. Friedman*
Matthew R. Friedman
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 429-3000
mfriedman@steptoe.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2023, I electronically filed this **BRIEF OF APPELLEE DISH NETWORK L.L.C.** with the Clerk of Court using the CM/ECF System.  Counsel for all parties are registered CM/ECF users and will be served with the foregoing document by the Court's CM/ECF System.

/s/ Matthew R. Friedman
Matthew R. Friedman
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 429-3000